Dewey, J.
The premises in controversy, with a much larger tract adjacent, were formerly the property of Jabez Hatch, under whom both parties derive title; the demand-ant, under a title of earlier date, being by virtue of a deed from Hatch to John Curtis and Thomas Ridley, bearing date September 28th, 1811, and a subsequent deed conveying, to Curtis, Ridley’s interest in the estate thus conveyed; the tenant, under a deed from Jabez Hatch to David Moody, bearing date February 23d, 1814, and by subsequent conveyances by the grantee, and those holding under him, to the tenant, The parties before us are the owners of contiguous lots; and the question is one of boundary line between their respective lots. As Hatch was the owner of the entire tract held by both parties under these deeds, at the time he made the conveyance to Curtis and Ridley, and the tenant derives title by deed torn Hatch, executed many years afterwards, it is only necessary for Curtis to establish the fact, that the demanded premises were embraced in his deed, to give him the better title, as against Francis, holding under a junior deed.
*435 The question before us is upon the construction of the deed of Hatch to Curtis and Ridley, of the date of September 28th, 1811. The southern line of the Curtis lot is the matter more directly in question, as it is that line that adjoins the land of Francis ; but as, by the deed to Curtis and Ridley, the southerly line of the lot conveyed ,to them by Hatch is to be parallel with the northern boundary line on Capen & Drake, to the channel or low water mark, the location of the northern boundary line is first to be settled, and, that having been established, it will, as it is contended by the demandant, control the southern, which is to be parallel with it, and giving rhe width of 133 feet to the lot.
On the part of the tenant, it is contended that the northern line is to run without deflection, in conformity with the line of Capen & Drake’s wharf, about south 60° east, to low water mark.
On the part of the demandant, ‘it is contended that the northern boundary line is upon Capen & Drake’s wharf, so far as the wharf extends, and the residue of the line is upon Capen & Drake’s flats, irrespective of the line of the flats, being in a continuous straight line with the wharf, and in truth, as is now showm, being a deflecting line, and deviating very considerably from a course south 60° east.
In the absence of monuments, or other controlling circumstances, a conveyance, in which the boundary line was stated to be one running from some given point to another point, would imply a straight line; and a conveyance by a line described as of a certain course by the compass, would be assumed to be a straight line.
But the great question will be found to be, whether the familiar and well settled rules of law, that courses and dis tances, indicated in a deed, are to yield to monuments and abuttals, described as boundaries in the deed, where there is a conflict between the courses and distances and such monuments or abuttals, are to be applied to the present case. Are there any such controlling monuments given in this deed; or is it merely the ease of a boundary running from one given *436 point to another, with nothing to require its course to deviate from one continuous straight line ?
It is strongly urged upon us, that the intention of the parties demands the construction, that the north line shall be a straight line, and in the course of about south 60° east. The cardinal rule on that subject is very well stated by one of the counsel for the tenant, and is precisely that which we adopt in the present case, to wit, “ that the intent of the parties, as derived from the deed itself, is to govern the construction.”
The case of Dawes v. Prentice, 16 Pick. 435, a case much relied upon by the tenant for other purposes, illustrates and applies the rule, and shows that the intention which the comb are to regard is not that loose and general purpose floating in the mind of the party, but that precise intent which the language of the deed requires to be inferred, when it speaks in plain language. The court, in the opinion there given, admit, that the probable intention of the parties to the deed was to convey the land according to the boundary claimed by the demandant; but held, that, inasmuch as the parties had designated the controverted line in the deed itself by a monument, the line of the monument must control, and the particular intent must control the general intent. The above case strikingly illustrates what must be the ruling of the comb in the case now before us. Assuming, for the purposes of the argument, that the parties supposed that the south line of the flats of Capen & Drake would be a line of about south 60° east, and that it would be substantially a straight line, and that the description would convey to Curtis a tract lying in the shape of a parallelogram; yet, if the language of the deed carries with it the particular intent, namely, that the north line of the land conveyed is to be bounded on Capen & Drake’s flats, that is the intent to which effect is to be given: and the general purpose, that the line should be a straight line, must yield to the particular purpose expressed in the deed.
As to this matter of intention, v'hich the counsel for the tenant so strongly urge upon us, the case of Cornell v. Jack *437 son, 9 Met. 150, is very much to the point. That was a case where the question arose upon a conveyance, in which the boundary was thus : “ On the north, by land of Tolman ; ” and it appeared in the case, that the grantor in the deed in question and the said Tolman had, before the making of this deed, by parol agreed as to the course of this line, put up stakes, and the parties had actual occupation according to the line agreed upon, yet, upon the establishment of the true line of Tolman, it being found to differ from the reputed line and the line of occupation, the court held, that the true line of Tolman’s land was the boundary to which alone effect could be given in construing the deed. In the opinion pronounced in that case, by Wilde, J., he says: “ It has been argued, that it must be presumed that the grantor intended to convey the premises in conformity with the conventional lines, because he supposed, at the time of the conveyance, that those were the true lines; and this may well be. But he also must be presumed not to have intended to convey any part of the adjoining lots, to which he had no valid title. The question therefore is, not what land was supposed to be conveyed, but what land was actually conveyed ; and this must be determined by the description in the deed.”
The case of Cornell v. Jackson was an action of covenant broken, and presented the question in the form the tenant says this demandant should have done, namely, by an action against Hatch, or his representatives, seeking to hold the party to warrant what was supposed to have been the premises conveyed. But if the case just cited is sound law, most clearly Curtis could not have charged Hatch upon his covenant of warranty, for any failure of title of any land north of Capen & Drake’s flats, if the flats are the boundary given in this deed.
It is then urged, that the line of the flats of Capen & Drake was not a visible monument to the eye, and, for that cause, should not be allowed to control the courses stated in the deed.
It is true, that a line of boundary “ by the flats ” of an adjacent proprietor may not be so obvious a monument as some *438 others. But that a boundary on the lands of A., whether the lands of A. be wild land, without any visible monuments, or actually enclosed, has all the controlling effects of a monument in limiting the extent of the grant, is quite certain. It is a very usual form of conveyance, and, when adopted, it places upon the deed a boundary line that is controlling, and overrides all loose and general suppositions of the parties, as to the location of the land granted. Whether it be called an abuttal or a monument, the effect is the same. In looking at our own volumes of reports, numerous cases will be found where fuff and controlling effect has been given to a boundary on the land of an abutter. It was thus in Howe v. Bass, 2 Mass. 380, which was decided on such a boundary. In Pernam v. Wead, 6 Mass. 131, a boundary “ on the land of A.” was called by Parsons, C. J. a fixed monument. In the cases of Crosby v. Parker, 4 Mass. 110, Cornell v. Jackson, 9 Met. 150, Flagg v. Thurston, 13 Pick. 150, Clark v. Burt, 4 Cush. 399, and Cleaveland v. Flagg, 4 Cush. 81, full effect was given to a boundary on the land of a third person, as a monument; and yet, in many of these cases, the true and legal line was not only one without any visible monument; but there was another line supposed by the parties to be the true line, and having fences, or stakes, or other external evidences of a line¡
In Cox v. Couch, 8 Barr, 147, it was held, that where land is described in a deed of conveyance by courses and distances, and also by calls for the line of the adjoining owner, if there is a discrepancy, such calls for the line of the adjoining owner invariably govern. The like doctrine is found in Carroll v. Norwood, 5 Har. & Johns. 63; Eaton v. Thayer, 3 Green, (N. J.) 71; Cherry v. Slade, 3 Murph. 82.
The case of Dawes v. Prentice, 16 Pick. 435, is strongly urged upon us, as analogous to the present, and as furnishing a precedent that should lead the court.to adopt the construction, that the north line is a straight line. But the cases are, in truth, widely different. In Dawes v. Prentice, the line was thus described, namely, “ from Purchase street to the capsill of the wharf, about one hundred and fourteen feet, and from *439 thence down to low water mark; ” but by this boundary the court held, as very clearly they must, “ that the line below the wharf is to run the same course as the line of the wharf; ” and for the plain reason, that there was nothing to indicate a change of course below the wharf. The present case has, as a part of the description, just what was wanting in the case of Dawes v. Prentice, a monument or abuttal below the wdiarf, namely, “ the flats of Capen & Drake,” and that is a new call that must be answered. But for the introduction of the “ flats ” as a part of the northern boundary line, the northern line might have been held a straight line. The parties have introduced them, and they must have their proper effect.
The argument, on the part of the tenant, assumes that the grantor has, by the language of his deed, carefully and accu.-rately described the direction of the northern line by a monument, namely, the wharf of Capen & Drake, and by the course, of about south 60° east to the sea, and that the description “ by the flats of Capen & Drake,” is a mere repetition of the boundary before given, by way of indicating the supposed ownership of the adjacent tract by Capen & Drake. If the facts had been so, the argument would certainly be one deserving consideration, upon the ground, that the latter recital should yield to the former, if there was a discrepancy. But the fallacy of this position lies at the very threshold. There is no such primary description of a boundary on Capen & Drake’s wharf, and thence continued in a course about south 60° east to the sea. The flats are not introduced by way of repetition of the boundary; they are as much a part of the original recital of the northern boundary line, as the wharf is, and used in precisely the same way; and the wharf may as well be rejected as a boundary as the flats ; and the latter must be held to be as much a portion of the first description of the boundary as the former. The precise language of the deed is this: “ Running in a direction of about south 60° east, bounded northerly on Capen & Drake’s wharf and flats to the channel or low water mark.” The flats and the wharf are alike boundaries of a fixed character, and wherever *440 they are found to be, that is the northern boundary of the land conveyed.
It is strongly urged here, that the fact, that the wharf and the course of south. 60° east nearly correspond, should lead to the rejection of the flats as a boundary, if the flats are inconsistent with the course of south 60° east; but this would be to give to the course, stated as it is in the very general form of expression of “ about ” so many degrees, a controlling influence over an abuttal, as a boundary, which cannot be sanctioned. It would be to control that most familiar form of boundary, namely, “on the line” of the adjacent owner, which manifestly indicates the particular purpose of the grantor, as limiting it to that line.
It is then further argued, that the description, “ bounded northerly on Capen & Drake’s flats,” may be fully answered by adopting the line claimed on the part of the tenant, that is, a line running through and dividing Capen & Drake’s flats; and it is said that, in such case, the northern line of land conveyed will be literally on a paid of Capen & Drake’s flats. But such a construction of this deed is, in our view, entirely unwarrantable. It is the external line of Capen & Drake’s contiguous flats, that is referred to in the deed as a boundary, not a line running through their flats and dividing them. That a conveyance of land, purporting to be bounded on other lands, cannot be so construed as to include any of the lands on which it is so described as bounded, was directly decided in the case of Nash v. Atherton, 10 Ohio, 163.
It is in the next place insisted, on the part of the tenant, that if the northern line be thus established, as a line having for its boundary the flats of Capen & Drake, yet the southern line cannot be made parallel with it through its -entire length ; as the dividing lines of flats, as now settled, would so far swing round as to embrace a portion of the flats formerly sold by Hatch to Davis; and, that being so, the southern line will not answer the description in the deed, “ bounded by other la nds of me, the said Hatch,” for the whole length of the line. The fact is so, and it is a consideration to be weighed, in connection with the other facts of the case, in giving a construe- *441 tíon to the deed. But it has no such decisive character as seems to be claimed for it. The fact, that this comparatively small gore will fail of answering the calls of the deed on the southern line, furnishes no good reason for giving such a direction to the northern line as would leave Curtis with a much larger parcel of Capen & Drake’s flats embraced in his deed from Hatch. So, too, there is this further distinction between the discrepancy on the northern and that on the southern side. On the northern line, to deviate from the line of Capen & Drake’s flats is to abandon wholly the boundary “ by the flats of Capen & Drake,” so prominently set forth in the deed. To deviate from the parallel southern line, for that portion cut off by a prior conveyance to Davis, is still to give effect to the southern line as described, namely, as “ bounded by other lands of Hatch,” as it will be so for a very considerable part of the line. It is also to abandon what the parties have taken as their starting point, or line first to be settled; and abandoning that because, although that can be clearly located by the call in the deed, the small portion of the southern boundary, which is the last line to be located, cannot be carried out for its entire length.
It would have been very easy to have introduced such a description for the northern line as would require a location in a straight line from the place of beginning, the “ southwesterly corner of Capen & Drake’s wharf.” It was only necessary to say, “ thence running in a straight line south 60° east, to the channel or low water mark.” But with this monument for a starting point, and, with this facility for describing it as a straight line, the parties elect to make the northern line one that shall correspond with the line of Capen & Drake’s wharf and flats, and introduced these monuments or abuttals as indicative of their particular intent as to the northern boundary. Finding this to be the language of the deed, we can only apply the rules of law, as we find them settled and applied to other cases and other parties.
It was also strongly urged that the line of Capen & Drake’s wharf, extended in a continuous straight line, had long been recognized as the boundary of the Hatch estate on the north. *442 It is said to have been so in the plan and division of Jabez Hatch, Senior’s, estate, in 1786, and by Jabez Hatch the younger, in 1804. This may be all true, and yet may have resulted from a general misapprehension of all interested, as to the legal line of the flats adjoining those uplands. It has been equally misunderstood by other parties, and cannot control the legal lines, when, by the terms of the deed, they are made to constitute the boundaries. It was so in Cornell v. Jackson, and in Cleaveland v. Flagg; but the true line was held the boundary when the party took a deed bounding on the land of another.
We can entertain no doubt as to the legal construction that must be given to the deed of Hatch to Ridley and Curtis, that the northern line of the premises conveyed by that deed is to be ascertained by taking the line of Capen & Drake’s wharf, as it existed in 1811, so far as the same extended, and for the residue of the line, taking the true line of Capen & Drake’s flats to the sea, or low water mark, deviating from a straight line, if need be, to conform to the line of those flats, and giving the proper width as stated in the deed, with a southern line parallel with the northern line thus established.
Until'a comparatively recent period, it may be true, as has been stated, that it was generally supposed, by the owners of these lands, that the side lines of the upland were to be extended in the same direction to low water mark. But in the various cases decided in this court, beginning with Rust v Boston Mill Corporation, 6 Pick. 158; Valentine v. Piper, 22 Pick. 85; Piper v. Richardson, 9 Met. 158; the doctrine that the side lines, in certain localities, were not to be thus extended in conformity with the upland, came to be pretty well understood, at least to be often judicially declared. The result has been that Valentine recovered land of Piper which Piper had supposed was his, Piper has recovered from Drake, and Drake from Curtis. By the decision of this court, Drake’s flats were found to be so located as to cause a deviation from the course of the line of those flats as it was formerly supposed to run. Drake’s flats swing round upon Curtis’s supposed *443 line. Curtis, in turn, seeks to swing round upon Francis, his next neighbor, keeping his 133 feet in width, which he was to have by his deed. His title being older than Francis’s, and from the same source, may give him this right, upon the proper construction of his deed. To hold him not so entitled would be to cut him off entirely from the sea, although his grantor, when he conveyed to him, was the owner of the adjacent land now claimed of Francis. That would be the result if his northern boundary line was, by the terms of the deed, necessarily a straight line from the end of Capen & Drake’s wharf. If Curtis shall succeed in maintaining his action, and Francis has not the like power to swing round upon his southern neighbor, it is because his title is a junior one, or by reason of the description of his boundaries, or some other sufficient cause, that confines him (o the remnant that remains, be the same more or less, after giving effect to the deeds of Hatch to Curtis and Ridley, and Hatch to Davis. As to that, however, no question is row before us, and I have alluded to the subject only because ■ t seemed proper, in reply to some of the remarks of the counsel for the tenant, urging' upon us the great injustice that would result from a decision against his client.
Another point was taken in the defence of a distinct character, and one not affecting the general question of title, but as a ground for defeating a recovery by the demandant in the present action. The tenant has, since the commencement of this suit, become, by purchase, the assignee of certain outstanding mortgages, made by the ancestor of the demandant; and this fact he now relies upon in bar of the further maintenance of this action.
It is quite sufficient to say, in answer to this line of defence, that evidence of an outstanding title acquired by the tenant after the institution of the suit, is inadmissible. Especially should it be so held, as respects the acquisition of an outstanding title of a mortgagee of the demandant. If it were otherwise, no one who had mortgaged his estate, however small the incumbrance, could safely institute an action at law to settle a controverted title with a third person, without the *444 hazard of being defeated of his judgment, after a protracted and expensive litigation, by such new rights acquired under a mortgagee. The cases cited warrant no such defence, but the contrary is the well settled law. Andrews v. Hooper, 13 Mass 472; Hall v. Bell, 6 Met. 433; Tainter v. Hemenway, 7 Cush. 573; Parlin v. Haynes, 5 Greenl. 178.
Whatever may be the effect of acts of the demandant, subsequently to the commencement of the action, in defeating his action, by making an entry on the tenant, or by a release from himself of all his interest to the tenant; it is quite clear, that a title, acquired from a third person pending the suit, cannot avail the tenant in defence of such action.
No sufficient ground being shown for a nonsuit, the case, under these rulings of the court upon the questions submitted to them, will, according to the agreement of the parties, be submitted to the jury, as to other questions that may be properly put in issue. Case to stand for trial.
A trial was accordingly had in this court at November term, 1853, before Merrick, J. who made the following report thereof:
“ The tenant pleaded nul disseisin, by direction of the court as and for the general issue, and filed in addition, as a specification of defence in bar to the further prosecution of the suit, an averment, that as assignee of certain mortgages made by the demandant’s ancestor, the tenant, since the last continuance, namely, on the 14th of December, 1853, had notified the demandant that thenceforth he should hold possession of the lands described in said mortgage deeds, for condition broken, and for the purpose of foreclosing the same. The tenant offered to put in evidence to maintain said specification, but the judge ruled, reserving the question, that the facts, if established, would be no legal bar to the further prosecution of the suit.
“ To maintain the issue, the demandant offered in evidence a deed of Jabez Hatch to John Curtis and Thomas Ridley, dated September 23d, 1811. Also, a deed of said Ridley’s administratrix, who was duly authorized to make the convey- *445 anee, to said Curtis, of his interest in said land, dated March 9th, 1818. The demandant then offered the record of a judgment heretofore recovered in this court, in a suit, wherein one Tisdale Drake was demandant, and John Curtis, the ancestor of the demandant in this suit, was tenant. To this evidence the tenant objected; but the court ruled that said judgment was admissible as evidence to show the true boundary line between the estate of said Curtis and said Drake, at the time when the action wherein it was rendered was commenced; and that it was competent for the demandant to show that the question in controversy between the parties, on the trial of said action, and which was determined therein, was solely in relation to the boundary line between their respective estates according to the titles by them severally held, at the date of the conveyance by said Hatch to said Curtis and Ridley, except so far as the same was affected by the subsequent disseisin and adverse possession of said Curtis, and Curtis and Ridley.
“ The demandant also, to show what was the question in controversy between the parties on the trial of said action, and which was determined therein, offered in evidence an agreed statement of facts entered into by the counsel in said suit of Drake v. Curtis; also a paper, purporting to be a memorandum of the opinion of the court, in said suit, which memorandum, it was agreed by the tenant should be deemed and taken to be the opinion of the court delivered upon said statement of facts. [Said statement of facts and memorandum of opinion are copied .in the margin.*] But to *446 all the foregoing proposed evidence the tenant objected as incompetent ; and the same was admitted by the court. The *447 demandant, for the same purpose, also offered the testimony of Tisdale Drake, to show that there had been no conveyance or agreement, known to him, between the parties to said suit of Drake v. Curtis, or their predecessors in the title, altering the lines of said estates, since said conveyance by said Hatch to Curtis and Ridley. To this evidence the tenant objected, but the court overruled the objection, and the witness testified as aforesaid.
“ The tenant then produced from the files of said suit of Drake v. Curtis, and offered in evidence, a written motion of the counsel of the tenant to the court to set aside and relieve *448 the tenant from the agreed statement of facts hereinbefore referred to, as having been improvidently and by mistake entered into ; but the court refused to admit the evidence.
“ It was shown by testimony of the demandant’s witnesses, that prior to 1810, Drake’s wharf was built and extended down to the first jog on the plan, [ante, 430.] And the counsel of the tenant moved the court to instruct the jury that by the legal construction of the deed of Hatch to Curtis and Eidley, the northern boundary of the estate thereby conveyed was the entire south line of said wharf, as the same then existed, [as shown by the dotted line on the plan,] and not merely that part of said wharf which extended down to the first jog, as shown by said plan; but the court refused so to instruct the jury, but did instruct the jury that said wharf, constituted such boundary down to the first jog, and no further.
“ The tenant offered the following written prayers for instruction by the court to the jury: 1st. That whether the judgment, in Drake v. Curtis, does establish, as between said parties, the south line of the estate of said Drake, as it existed at the date of the conveyance of said Hatch to Curtis and Eidley, is matter of law, to be determined upon the record, as applied to the localities as proved, or upon the other facts proved in the case. 2d. That said judgment, if admissible at all, as ruled by the court, is merely evidence tending to show where the south line of said Capen & Drake’s flats was, at the time of suit brought between said parties, and not at the time of the conveyance of said Hatch to Curtis and Eidley. 3d. That as matter of law, in legal construction, the judgment in Drake v. Curtis of itself does not show that the south line of Capen & Drake’s flats and estate was parallel to the lines of Summer street, but coincided only partially therewith; and that - oral or other evidence to show from the course of the trial in that case that this may be explained, upon the ground that a question of disseisin by the tenant was raised and passed upon by the verdict, is inadmissible.
“ The court acceded to, and adopted as part of its instructions to the jury, the propositions stated in the first and second of said prayers, ana. in the first part of the third prayer, but *449 declined to adopt the la'it clause in said third prayer; and instead thereof held that oral and other proper evidence was admissible, to show that a question of title by disseisin and adverse possession and occupation' was raised and passed upon by the jury on the trial of that action.
“ The court also instructed the jury that said judgment in the case of Drake v. Curtis proved what was the line of boundary between their respective estates at the time of the commencement of said action; and that if the evidence produced in the present case was sufficient to show that the line thus found by the jury, and established by the judgment, was found by the jury in that case upon and according to the title severally held by those parties at the date of the conveyance of Hatch to Curtis and Ridley, (except as it had been affected by the subsequent disseisin and adverse occupation of Curtis and Ridley,) it tended to prove also what was the line of boundary at that time, And the court further instructed the jury that this judgment, establishing this line between the lands of Drake and Curtis, was, primé facie, and in the absence of any other evidence upon the subject, sufficient evidence to establish the north line of Curtis’s estate, and to authorize the jury so to find in this action, if the evidence satisfied them that no change had been made in the line between Drake and Curtis since the conveyance of Hatch to Curtis and Ridley in 1811; and that the north line of Curtiste estate being thus established, he was entitled to the land which would be included by a line one hundred and thirty-three feet distant therefrom and parallel thereto; it being conceded that Hatch was then the sole owner of that tract of land.
“ And the court further instructed the jury that the instruction >. of the judge to the jury in the case of Valentine v. Piper were correct as explained in the opinion of the court rep rted in 22 Pick. 85; and afforded a rule of decision in thr case, as far as upon the evidence before them, the cases were similar to each other.
“ The tenant also prayed the court to instruct the jury as follows: That notwithstanding said judgment, it is open to the tenants to show by proof of the lines of occupation and *450 conveyance, from the earliest period, of the estates south of Summer street, that the proprietors of said estates had agreed that the lines of their estates should be taken and deemed to run nearly in a direction of south 60 degrees east; and upon such evidence it is competent for the jury to presume releases and conveyances among said proprietors, establishing such lines, and that the same are now lost. To which prayer the court fully acceded, and instructed the jury in conformity to the request therein contained.
G. G. Loring and S. Bartlett, for the tenant.
1. The specification of defence, that the tenant, as assignee of mortgages made by the demandant’s ancestor, had notified the demand-ant, since the last continuance, that he should thenceforth hold for condition broken, was valid, if established. The former decision of this court, on this point should be revised. for the following reasons: The only cases, in any court which are opposed to the tenant’s position, are three in this commonwealth, and one in Maine, cited in the former opinion in this case, cmte, 444. The only reasons given in these cases are, that the plea always refers to the commencement of the action; and that to allow a tenant, who holds without right at the time of the commencement of the suit, to avoid liability to pay costs, and acquire a right to tax costs, by the acquisition of an independent title, pending the litigation, by a cause over which the demandant had no control, might work great injustice. In all the cases cited, except from 7 Cush., the question was raised under the general issue, and not by plea puis darrein continuance; and undoubtedly the plea of the general issue refers to the commencement of the action, and not to the time of the - plea. Toms v. Powell, 7 East, 536. Besides, if the tenant admit that the demandant was seised and disseised, he must plead all other matters specially. Jackson on Real Actions, 154. The reasons given for the decisions relied upon are unfounded. The clear rules of pleading in real, as well as in other actions, allow the defendant, by plea puis da/rrein continuance, to set up any bar which defeats the action. Jackson on Real Actions, 164,165, 168 ; Gould PL 373. And no costs are given to the defendant up to the time of plea pleaded; and the plaintiff is deprived of costs by his own act. Foster v. Jones, 15 Mass. 185 ; Lyttle-ton v. Cross, 4 B. & C. 117; Baker v. Morrey, 1 Moore & Payne, 140. By the well settled principles of law, after condition broken, the title becomes absolute at law in the mortgagee. If a breach of condition merely had occurred, pending this suit, and the tenant had not acquired the title of the mortgagee, yet, as the demandant’s legal estate had terminated, it might, perhaps, have been pleaded in bar puis darrein continuance ; or, at least, if the holder of the mortgage had entered upon the tenant. Jackson on Real Actions, 143, 151, 168. The fact that the tenant has procured the title of the mortgagee, and given notice that he holds under it for condition broken, places the demandant in no better condition than if the same steps had been taken by the mortgagee. The tenant does not put his case merely upon the equitable doctrine of rebutter; nor on the ground that the court will give effect to his rights to prevent circuity of action ; but upon a legal title, derived from the act of the demandant himself, in not performing a condition, which omission is as effectual, as far as the mere title is concerned, as if the demandant, since the continuance, had executed to the tenant a release. See Parlin v. Haynes, 5 Greenl. 180, 181; Foster v. Jones, 15 Mass. 185.
*450 “ But the court, in the course of its charge to the jury, commented upon the evidence in this case relative to the said supposed presumption; and among other things, particularly called their attention to the peculiarity of the law in relation to the ownership of flats — that there could bé no disseisin of them, but by actual occupation, and that no title by disseisin could be acquired thereof, except by an exclusive adverse possession — as affording a ground of improbability, that any such agreement, releases, or conveyances had been made.
“ In relation to the claim of the demandant for rents and profits, the court, for the purposes of the trial, reserving the question, instructed the jury that they must ascertain and compute the same from a periqd of six years prior to the date of the writ, down to the time of the verdict. The jury returned their verdict that the rents and profits thus computed amount to $25,756, and that the betterments amounted to $15,000.
“ If any of the foregoing rulings of the court are erroneous, the verdict is to be set aside, and a new trial granted in whole or in part as the whole court shall order accordingly; otherwise, judgment to be rendered on the verdict.”
The argument upon this report was had at November term, 1854.
2. The admission in evidence of the judgment in Drake v. Cwrtis, coupled with the instruction with which it was accompanied, was erroneous. The judgment was between different parties, not privies of the plaintiff in blood or estate, and was rendered upon an artificial case founded upon the admissions of the parties to it. Hurst v. NP Neil, 1 Wash. C. C. 70 ; Piper v. Richardson, 9 Met. 156 ; Sargent v. Salmond, 27 Maine, 539; Putnam Free School v. Fisher, 34 Maine, 176; Douglass v. Howland, 24 Wend. 35; Oakley v. Aspin-wall, 4 Comst. 514; Lee v. Stiles, 21 Conn. 500 ; Baring v. Fanning, Paine, 549; Qoundie v. Northampton Water Co. 7 Barr, 233; Green v. New River Co. 4 T. R. 589; Doe v. Derby, 1 Ad. & El. 783; Eastman v. Cooper, 15 Pick. 276, 285 ; Heard v. Lodge, 20 Pick. 53 ; Phans v. Rees, 10 Ad. & El. 151; 1 Greenl. Ev. §§ 189, 523, 524, 535.
Even if the judgment was legally admissible, the evidence of the facts proved, and of the proceedings at the trial of the action of Drake v. Curtis, in order to show upon what grounds the jury, in that case, found their verdict, was inadmissible ; for the tenant, being a stranger, cannot be compelled to come prepared to show or contest the principles or grounds upon which a jury in another case founded their verdict; and a recorded judgment cannot be added to or explained by the finding of a new jury upon the question of what ground the former jury proceeded upon. Ma/rmy v. Harris, 2 Johns. 24.
3. The instruction, that the northern boundary, in the deed of Hatch to Curtis & Ridley, followed Capen & Drake’s wharf only down to the first jog, was erroneous; for that deed refers to the whole wharf, and so this court has held. It is no answer to this, to say that the line would not be straight: or the same is true with the line, as settled by the court, after it leaves the wharf; it has to jump a long distance southwardly to find the line of Capen & Drake’s flats. If, after arriving at the first jog, the line struck the true line of Capen & Drake’s flats, there might be some ground for the construction that part of the wharf only was intended as a monument; but such is not the fact.
4. The comment of the judge upon the law as to the dis-seisin of flats, and his statement to them that this peculiarity of the law afforded a ground of improbability that any agreement had been made by the proprietors of flats south of Summer street, were erroneous, and calculated to mislead the jury.
5. The ruling of the judge, as to the time for which rents and profits were to be computed, was erroneous. Before the Rev. Sts. c. 101, the demandant’s only remedy for rents and profits was by action of trespass, brought after recovery in a writ of entry, and in such an action the right of recovery was restricted by the general statute of limitations to six years before action brought. Stearns on Real Actions, 361, 408; Note of commissioners on Rev. Sts. c. 101, § 14. Chapter 101 of the Rev. Sts. has abolished this remedy, and provided that “ the tenant shall never be liable for the rents and profits for any longer term than six years; ” except when the sum due him for improvements exceeds the six years’ rents and profits, in which case any rents and profits received by him prior to the six years, shall be applied towards the extinguishment of the difference, but there his liability shall cease. Rev. Sts. c. 101, §§ 18, 30, and commissioner’s notes. The judge allowed the demandant to recover for more than twenty years’ rents and profits; and as the value of the improvements, as found by the jury, is more than sufficient to absorb six years’ rents and profits, the demandant should have judgment for the land only.
R. Choate and F. B. Ch'owninskield, for the demandant.
The opinion was delivered at March term, 1855.
Shaw, C. J.
This cause has been long pending in this court, has been many times brought to the notice of the court *454 and at various stages has received a degree of consideration which the importance of the subject, and the intrinsic difficulty of many of the questions involved in it, have demanded. The action was commenced in 1839, shortly before that part of the revised statutes went into operation, limiting the time within which real actions should be brought, and in many respects altering the modes in which they should be conducted. A suit had been brought against this demandant, by Andrew Drake, the object of which was to recover a part of the flats claimed by Drake, on the northerly side of Curtis’s wharf and flats ; and Curtis, the tenant in that action, probably foreseeing that if that claim on the part of Drake, his coterminous neighbor on the north, should be successful, he7 on the same principles, might have a claim against his southern coterminous neighbor, took the precaution to commence this action against Francis, before the change of the law. But we suppose that this suit was not actively prosecuted, until after the conclusion of Drake’s suit, by which a parcel of flats was recovered against the present demandant, on his northerly side. Curtis thus having failed in the defence of the suit, brought against him by Drake, his coterminous neighbor on the north, prosecuted this action against Francis, his coterminous neighbor on the south, on the ground that if the direction of the lines, in which the flats were to run, towards low water, had been rightly fixed and established in the case determined, the same rule, applied to his southerly line, would carry his flats further to the south, and take in a part of the flats claimed by the tenant.
1. The first question, arising on this report, was considered in a former opinion; but as it has again been argued, we proceed to consider it again. It is thus stated in the report: The tenant, in addition to the general issue, filed a specification of defence, in bar to the further prosecution of the suit, an averment, that as assignee of certain mortgages, made by the demandant’s ancestor, the tenant, since the last continuance, namely, on the 14th December, 1853, had notified the demandant that thenceforth he should hold possession of the land described in said mortgage deeds, for condition broken- *455 and for the purpose of foreclosing the same. It is not stated in terms, that the mortgages cover the whole of the same land, now in controversy, but we presume it was so intended, and the argument assumes it. Neither does it appear by the specification, that the tenant has acquired these mortgages since the last continuance, but only that, since the last continuance, he has given notice to the demandant of his intention to hold possession of the premises, for condition broken. We suppose, if relied on at all, as a bar to the demandant’s action, it is the holding of a freehold title, under the demand-ant’s ancestor, whether in possession for condition broken or otherwise, which is so relied on.
Nor do we suppose that it was the intention of the tenant to waive all other pleas, and all other grounds of defence, and rely only upon his title of mortgagee, and notice of holding for condition broken, which we suppose would technically follow a plea puis darrein continuance at common law.
But we have not placed much reliance on these considerations, because we think the question may well be decided on other grounds, more directly affecting the merits.
This action had been pending nearly fourteen years, when this plea was put in. But, in general, pleadings relate to the time of the commencement of the action, and if the plaintiff has a good cause of action, when his action is brought, the defendant cannot defeat it, by showing an outstanding title in a stranger, or procuring a new title to himself, after action brought. Le Brett v. Papillon, 4 East, 502. In that case, it was said to be a settled rule of pleading, that no matter of defence, arising after action brought, could properly be pleaded in bar of the action generally. This is to be taken with the exception of an act done by the plaintiff or demandant himself, as when, in a personal action, he receives payment of his debt, or in a real action executes a release, or enters and ousts the tenant. It has been so settled by repeated decisions in this commonwealth, cited by the tenant. Andrews v. Hooper, 13 Mass. 472; Hall v. Bell, 6 Met. 431; Tainter v. Hemenway, 7 Cush. 573. In these cases, as well as in that of Parlin v. Haynes, 5 Greenl. 178, it was held that the tenant in a real *456 action, cannot defend himself on the ground of a title acquired by him after the action brought.
It is argued that the adjudications afford no sufficient authority for the position, where the tenant comes in and pleads a new title, acquired since the last continuance, because the reasons assigned for the rule, in the cases cited, are that it would affect the plaintiff injuriously, in the matter of costs ; whereas, it is insisted, such effect would not follow, if pleaded as a new defence, which has arisen since the last continuance. We think the authorities cited go no further than to show, that, in the latter case, the tenant could recover costs, not for the whole suit, but only from the time of the plea pleaded; but not that the demandant would recover his costs up to that time.
But this is not the whole of the reason assigned for the adjudications. The reasons distinctly assigned by Wilde, J., in Andrews v. Hooper, 13 Mass. 476, are, that “ evidence of a title thus acquired, has been uniformly rejected in our courts. A different course would operate unequally and unjustly, by enabling the tenant to fortify a defective title, and avoid the payment of costs, for which he might otherwise be liable, and which, in the course of an expensive suit, might even exceed the value of the land.” The same reason is assigned in the case in Maine.
But further, after a long course of decisions, we are not in the habit of looking only to the reasons given by the judge who draws up an opinion. A case takes its effect, as a judicial precedent, from the adjudication, though all the reasons on which it was founded, may not be given in full in the report of the case. It is now a rule of law well settled by authorities.
But if a mere legal, outstanding, absolute title, purchased after action brought, would not be a good defence, cl fortiori the purchase of an outstanding mortgage cannot have that effect. A mortgage, under the laws of Massachusetts, is an estate of a very peculiar character, created and regulated by law. Tt assumes the form of a conveyance in fee, and vests a fee in the mortgagee for many purposes. But it is a defeasi- *457 ble estate, defeasible at law, by payment or other performance, before condition broken; but in substance it is still defeasible in another form, after condition broken, and till foreclosure. Until then, it is not an absolute estate in the mortgagee. Until the mortgage is foreclosed, it is liable to redemption; upon redemption the estate is restored to the mortgagor, or his assigns, with all its easements and other incidents. In the late case of Ritger v. Parker, 8 Cush. 145, where an easement for a right of way was established over one estate in favor of another, and the same proprietor became possessed of one tenement, either absolutely or as mortgagee in possession, and also of the other tenement as mortgagee in possession, holding to foreclose, it was held that there was no merger, no union of title by which the right attached to the dominant tenement was lost, or the servient tenement released; because, upon redemption, the easements and other incidents would follow and pass with the estate.
And we think any other view would lead to great injustice; and, in a case like this, we are to look at substantial rights, rather than forms, in order to do justice to parties. A mortgage is in form an estate in fee, and vests a legal estate in the mortgagee and his assignee. In substance, it is a security for money. If the grounds, on which the argument is rested in this case, are correct, the same result would follow, in a case where the party in a real action has established his title to a large estate, should the tenant become holder of an outstanding mortgage for ever so trifling an amount. But the nature of the two rights, and the remedies afforded by law, for the assertion of each, tend to show, that the principle of compensation or set-off, cannot apply to them. As well after as before foreclosure, there is a right of redemption, upon the exercise of which the title of the mortgagee is wholly defeated, as if it had never existed. So the remedies for each show that the principle of rebutter has no application. It is true, that a mortgagee has a right to bring a suit, in the form of a real action ; but it is a peculiar proceeding, and qualified by provisions of law. If successful, he can obtain a conditional judgment only, and on payment of a sum of money, *458 perhaps a small one, his judgment never touches the title. Besides, if this plea were allowed, how is the inquiry to be judicially conducted, to ascertain how much, if any thing, is due on the mortgage; how is it to be tendered or paid into court, and the mortgagor restored ? Considering the diversity in the legal nature and effect of the two rights, and the remedies adapted to each, we think that the existence of one is not directly repugnant to, and subversive of the other.
But, in truth, it appears from a more careful examination of the earlier proceedings in this case, that the tenant has acquired no new title by the assignment of any mortgage to him since the last continuance, but that the mortgages in question had been held several terms; and the only matter relied on is, that since the last continuance, the tenant being in possession, had given notice to the demandant that he would thenceforth hold the estate for condition broken, and for the purpose of foreclosure. But this gives him no new estate; it does not change the character of his title to the estate embraced in the mortgage, and affords no new ground of defence. The opinion, therefore, heretofore given, iu this cause, by Mr. Justice Dewey, is conclusive upon this point.
2. The next question arises from the admission in evidence, by the judge who tried the cause, of the record of a judgment previously recovered in this court, by Tisdale Drake, as demandant against John Curtis, the demandant in this suit.
In order duly to understand this question, and the law applicable to it, it will be necessary to take it in connection with the other facts, and the case which had preceded it, and the particular stage of the inquiry at which it was offered. The demandant and tenant both claimed under deeds of conveyance from Jabez Hatch; the demandant having the elder, and the tenant the junior conveyance. If, therefore, any portion of the controverted territory, being open and uninclosed flats, not built on or covered by any structure, but flowed by the tide, was embraced in the deed from Hatch to Curtis and Ridley; and if subsequently, in the deed from Hatch to Moody, through whom Francis claims, any part of the same flats was embraced; it necessarily follows that the *459 latter must yield, because the grantee in the second deed could not take that which had previously been granted by the first.
And further, the case of Drake v. Curtis had previously been brought before this court, upon an agreed statement of facts, in which certain deeds and documentary evidence were agreed to, and the construction of which was submitted to the court, and a decision had been given on them. The principal subject of inquiry, in the case submitted, was the construction of the deed of Hatch to Curtis and Ridley, of the 27th of September, 1817; Ridley’s part having been afterwards conveyed to Curtis. The object was to ascertain the northern boundary line of the flats conveyed to Curtis and Ridley ; for, though the real subject of controversy between these parties, is the southerly line of Curtis’s' flats, yet as the southerly line of the flats conveyed by Hatch to Curtis and Ridley, was a line parallel to the northerly one, and at a certain number of feet (133) distant from it, ascertaining such northerly line would obviously fix the southerly one. The deed from Hatch to Curtis and Ridley, which the court were called on to construe, as fixing the northerly line of Curtis’s flats, was in its descriptive part in these words: “ A certain piece of land, wharf, and flats, with the buildings thereon, situated at the southeasterly part of said Boston, at Wheeler’s Point, so called, bounded as follows : Beginning at a point on the easterly side of Sea street, at the southwesterly corner of Capen & Drake’s wharf; and from said comer, running in a direction of about south sixty degrees east, bounded northerly on said Capen & Drake’s wharf and flats, to the channel or low water mark.” It is not necessary to follow the residue of the description, the above being the entire description of the northerly line in Hatch’s deed.
Upon this description, it was contended, that as the wharf of Capen & Drake, as a solid structure, and fixed, visible monument, extended down about 133 feet, and coincided exactly, or very nearly, with the course of south 60° east, it was not only to be taken as a monument, as far as it went, but that it gave a direction to the residue of the line, being a straight line, to low water mark; and this construction was *460 strongly urged as the line intended, by the counsel 'for the tenant. But the court, applying the well-established rules of construction, especially the cardinal rule that monuments and abuttals must control courses and distances, held that the wharf, so far as it coincided with the line called for, must govern, but beyond that “ the flats of Capen & Drake ” constituted an abuttal, and must control the course and distance south 60° east to the channel, and there the line called for by Hatch’s deed, from the point at which the fixed line of the wharf, as a monument, terminated, the ti-ue line of Capen & Drake’s flats must govern ; and although the parties intended one continuous line of south 60° east, because they supposed it the true southerly line of Capen & Drake’s flats; yet this was subordinate to the more general intent derived from the language used, which intent plainly was to bound the grantee on the real and true line of Capen & Drake’s flats. The grounds of this decision were stated in a full and very satisfactory manner, in the opinion heretofore delivered by Mr. Justice Dewey in this case.
We are now to consider another fact occurring in the anterior stage of these proceedings, which, in our opinion, has a material bearing upon the question, whether the judgment in the case of Drake v. Curtis was competent evidence in this case of Curtis v. Francis. We have already stated that the causes of Andrew Drake v. John Curtis, and Tisdale Drake, devisee of Andrew, v. The Same; and also the same demand-ants against Francis; and we may also add, the suits of Curtis against Francis, were all commenced before the 1st of January, 1840, when the revised statutes, respecting real actions, went into operation, and they were, of course, all pending in 1844. At the November term of that year, an agreement was entered into, by the parties in the first four cases above named, applicable to all the said cases. It will be perceived by the records in the two — for they were substantially but two, Drake v. Curtis and Drake v. Francis — that the south line of flats claimed by Drake extended so far south, that should it be ultimately established as his legal line, it would not only extend over a large part of the flats of Cur *461 tis, his coterminous neighbor on the south, but would also extend still further south, and include a portion of the flats claimed by Francis. When, therefore, Drake brought his action against Curtis, for the large portion claimed of him, he brought his action at the same time against Francis, for the smaller portion claimed of him. These actions were pending at November term, 1844, when the agreement was entered into for the disposition of those actions, to which Drake, Curtis, and Francis were parties. It will be perceived that the decisive question in both of them was, where the south line of Drake’s flats should be drawn; because that would regulate the north line of Curtis’s flats, and that would regulate the parallel south line of Curtis’s flats, and the south line of Curtis’s flats would regulate the line of Francis’s flats That south line of Drake’s flats, therefore, was first to be determined and established according to the evidence, and the law applicable to the title of proprietors of flats under the colony ordinance of 1641. Of course Curtis and Francis had a common interest, in opposing and resisting the claim of Drake in the ensuing trial between Drake v. Curtis.
The first question stated was whether Tisdale Drake, as the devisee of Andrew Drake, who commenced the suit, could come in and prosecute, as the law then stood, and it was afterwards decided that he could not; (Drake v. Curtis, 1 Cush. 395;) after which, we believe, the suit of Andrew Drake was discontinued, and the suit of Tisdale Drake prosecuted. The agreement then proceeded as follows: “ The parties agree to submit the question of title to the court, upon such deeds, wills, &c., as they respectively rely on, each party agreeing to furnish to the other party a schedule of the documents he will offer, days at least, before the time of trial. And either party, or the court, shall be at liberty to examine the surveyors employed by them, orally. It is agreed, that the court may determine the course of the lines running between high and low water mark, according to the legal rights of the parties, upon the evidence, and to be at liberty to draw all such inferences of fact as a jury would be authorized to draw.”
The agreement then went on to reserve to the tenant in *462 either action the right', after the determination of the court, to submit to a jury any question of adverse possession to bar the demandant, or any claim of the tenants for betterments, and rents and profits. If either of the said tenants should not elect to go to the jury, on the subject of adverse possession, the court were to render judgment for the demandant or the tenant, according to the lines settled by the court.
Upon this agreed statement, the causes came on to be heard by the court at March term, 1846, and both causes, that against Curtis, and that against Francis, were argued together. They were heard on the documentary evidence, the plans and sur* veys, and we presume, according to the agreement, the testimony of the surveyors. The causes were retained under advisement, until the close of the June adjournment 1846, when the opinion of the court was given by Wilde, J. The decision was favorable to the demandant, fixing the south line of the demandant, Drake, and the north line of the tenant Curtis, and the tenant Francis, according to the deed of Hatch to Curtis & Ridley of 1807, substantially according to the claim of the demandant, Drake. The tenants moved the court to discharge the statement of facts, that the question as to the location of said line might be left to a jury; but the motion was overruled by the court.
The case afterwards came to trial, we presume upon the right reserved to the tenants, to submit to a jury any right of adverse possession, to bar the demandant. The case came on to be tried before Wilde, J., at November term, 1846, and was submitted to the jury, who returned a verdict in favor of Drake, the demandant. Various objections were taken to the ruling of the judge, and still more to the refusal of the judge to give certain directions prayed for, and these, as questions of law, were presented, on a report of the judge, for the consideration of the whole court. This case came before the whole court, in March term, 1848, and was elaborately argued, both orally and in writing, and, after consideration, the objections were overruled. The directions of the judge at the trial were held to be correct, and judgment was rendered on the verdict for the demandant. Drake v. Curtis, 1 Cush. 395.
*463 This is the judgment which was offered in evidence, and admitted, under objection, in the trial of this cause. It was offered after evidence given of the deed of Hatch to Curtis & Ridley of September 23d, 1811, and in connection with evidence of the question in controversy in that suit, and the agreement under which it was tried. And the court are of opinion that, under the circumstances, it was competent evidence between these parties in this action.
We are aware that this particular case, in which these parties stand before the court in an adversary position, was not one of the cases, in which the agreement above cited was made. But this suit was then pending. It was as obvious then as afterwards, that in that action Curtis and Francis had a common interest to defend against the claim of Drake, and that if Drake could not succeed in recovering against Curtis, Curtis would have no occasion to proceed against Francis. It was therefore a common defence. Both of these parties did join' in an agreement with Drake, upon the mode, and the facts and evidence, on which the main question should be tried, and that the whole question of fact and law, independent of mere adverse possession and disseisin, should be tried and decided, The causes of Drake v. Curtis, and Drake v. Francis, were argued together; we do not see why it was not as competent for Francis as for Curtis, under that agreement, by his counsel, to adduce evidence, to offer surveys and examine surveyors, to submit all legal considerations, upon the questions in which they had thus a common interest, and on the trial of which they had made common cause, by an agreement which both had made with each other, and with their common opponent.
We are quite aware that, according to the general rule, on a tidal between parties, a prior judgment between one of them and a stranger is not competent evidence. It requires a careful consideration of the rule, however, to ascertain who is a stranger within its meaning. It is certainly not confined to a case, where the parties in the present suit were parties to the former; on the contrary, it is binding on all privies, either in blood, estate or interest. So of a warrantor who has notice of a suit, from one claiming under his warranty, with an op *464 portunity to defend. So parties severally sued on a policy, who have agreed to abide. Perhaps no case can be found exactly like the present in its facts, but we think it quite within the principle governing this class of cases.
The evidence was offered in the present case to show what was the south line of Drake’s flats when the suit was brought; and in addition to the presumption, that a line continues unchanged, when no deed or conveyance is shown to change it, we think it was competent to prove negatively, as far as such negative is capable of proof, that no such change had taken place.
It appears by the report, that to avoid the effect of this judgment, and the agreement under which the suit was prosecuted, the tenant in the present case produced from the files of said suit of Drake v. Curtis, and offered in evidence, a written motion to set aside and relieve the tenant from the agreed statement of facts before referred to, as having been improvidently and by mistake entered into, which was not admitted. The reason is to be found in the opinion of Wilde, J., already cited, who says, that after the court had made a suggestion of what their opinion was, the tenant’s counsel moved the court to discharge the statement of facts, but it was not much pressed, and there seemed to be no good reason why the parties should not be bound by their agreement.
We are therefore satisfied of the correctness of the instruction given by the court on the present trial that the judgment in the case of Drake v. Curtis proved what was the line of boundary between their respective estates at the time of the commencement of said action ; and that, if the evidence produced in the present case was sufficient to show that the line thus found by the jury and established by the judgment, was found by the jury in that case, according to the titles of the parties, at the date of the conveyance of Hatch to Curtis & Ridley, it tended to prove also what was the line of boundary at that time.
3. Another question is raised upon this report, which it is somewhat difficult to make intelligible, without the aid of the plan. But as we understand it, it is thus: At the time of *465 Hatch’s deed, the wharf of Capen & Drake, as a solid structure, extended down about 137 feet, the south side of which to that extent coincided with the line south 60° east, or very nearly so; and then (1811) the water line of the wharf turned north nearly at right angles with the line already mentioned, and distant 15 or 20 feet, at which point another section of the wharf projected, on a line nearly parallel with the first, and extended downwards towards the channel to some distance. The argument now is, that this lower section of Capen & Drake’s wharf should, like the upper section, be deemed the monument, called for in Hatch’s deed, as the northern boundary of his grant.
This construction, we believe, was never suggested or intimated, until since the opinion upon the construction of Hatch’s deed, given by Dewey, J., on the former hearing. In that, it was stated, perhaps without qualifying terms, that the solid structure of Capen & Drake’s wharf was to be taken as the southern boundary called for, by that deed of Hatch to Curtis & Ridley. But the fact had then never been called to the attention of the court, that there was at that time another section of Capen & Drake’s wharf, laying parallel to, and 15 or 20 feet northerly of the first section, as having any bearing upon the question of construction. The line insisted upon by the tenants was the face of the wharf as a monument so far down as it coincided with the course of south 60° east, (the first jog, as it is termed in the report,) and thence in the same direction to low water mark. The calls of the deed are two, namely, 1st by wharf; 2d, by flats. Taking the first monument, it is to be followed so long as the wharf continues in the prescribed direction south 60° east, and till the second is reached. As soon as the flats are reached, it then becomes necessary to seek the true line of flats, which is found southerly of the line of the wharf. And so we think there is no discrepancy, between the direction given on this trial, and that formerly given by the court as above stated. Undoubtedly, Hatch supposed that Capen & Drake’s wharf was in the true line of their title to flats, and that he was conveying up to that line, by the designation of Capen Sc Drake’s wharf and flats.” But though such mav *466 be supposed to have been his intent, yet it is subordinate to his expressed intent to bound on Capen & Drake’s wharf and flats, in the line designated, if that was the true line, but otherwise, so far as open flats were concerned, on the true southerly line of Capen & Drake’s flats. Having found the true line of those flats to be south of a straight line below the point to which the wharf extended in that direction, there must then of necessity be a change to the nearest point on the true south line of Capen & Drake’s wharf in order to satisfy this deed. This construction is put upon Hatch’s deed, not because the parties had such a line in their minds, but because it is required by the rules of law, applicable to the descriptive words, in which they have expressed the grant made.
4. The court having, at the request of the counsel for the tenant, instructed the jury that it was competent to show by proof of occupation and conveyances of the estates south of Summer street, that the proprietors of said estates had agreed that the lines of their estates should run in a direction of nearly south 60° east, and that it was competent for the jury to presume releases and conveyances accordingly, and that the same are now lost, accompanied the instruction with a comment, which was objected to, as tending to mislead the jury. The court, in charging the jury on the evidence relating to such presumption, called the attention of the jury to the peculiarity of the law in relation to the ownership of flats, that there could be no disseisin of them but by actual occupation, and that no title by disseisin could be acquired thereof, except by an exclusive adverse possession, as affording a ground of improbability that any such agreements, releases, or conveyances had been made.
We cannot perceive that this comment was calculated to mislead the jury; on the contrary, it seemed called for by the terms in which the prayer was made. It is a well known rule of evidence, that from long actual, adverse and exclusive possession, a lost grant or release may be presumed. The tenant prayed the judge to instruct the jury in this rule of law, as applicable to the proprietors of estates south of Summer street. But the term “ estates ” is equivocal. It may mean enclosed *467 uplands, or open flats. The presumption from such possession of gardens, orchards, pastures or other enclosed and improved lands, would arise from one species of occupation. But adverse and exclusive possession cannot be predicated of flats, unless built upon, or actually enclosed. As the prayer did not distinguish between the lands above tide water, lying south of Summer street, and the flats lying below, and as flats were the subject to which the presumption was to be applied, it seemed proper and necessary, in applying the rule of law to the subject matter, to distinguish as to what would be an actual and exclusive occupation of the different species of estates.
5. The next question turns upon the claim of the demandant on the one side for the value of the rents and profits due to him, and of the tenant on the other for the value of improvements, made by him on the premises. On this subject considerable evidence was offered on both sides. In reference to this, the court instructed the jury, reserving the question of its correctness, that they must estimate and compute the rents and profits, from a period of six years prior to the date of the writ, down to the time of the verdict. The jury returned their verdict, that the rents and profits thus computed amount to $25,756, and the betterments to the sum of $15,000.
By far the most important point in this inquiry is, for what term of time the rents and profits shall be computed. The counsel for the tenant insist that by force of the statute, Rev. Sts. c. 101, § 18, rents and profits can, in no event, be computed for a longer time than six years. There is no doubt that, prior to the revised statutes, the sole remedy of the demandant, for rents and profits, was by an action of trespass for mesne profits, to be commenced after a recovery of seisin in a real action, and that the statute of limitations limited the time for which mesne profits could be recovered, to six years next before the action was brought. The rule was founded on the theory that the demandant must be reinstated in his title and right of possession, before he could have trespass, which would lie only for a violation of the right of possession.
But the revised statutes, for reasons fully stated by the com *468 missioners, have provided another and a different remedy and one which is not cumulative and additional to the former, but which supersedes and supplants it. The revised statutes having provided that no real action can be brought or maintained, except when the demandant has a right of entry, and of course a right of possession, the old theoretic objection, that a party having no right of entry, but only a right of action, could not have trespass, was done away ; ana they then provided that, instead of a subsequent action of trespass for mesne profits, the demandant, in his real action to recover his title, should make his demand for rents and profits, to be inquired into, tried, and embraced in the judgment; and it has been determined by this court, that this is the only remedy which the demandant, who is obliged to bring his action to recover his real estate, can have for rents and profits. Raymond v. Andrews, 6 Cush. 265.
The consequence therefore is, that by the same process by which a demandant claims his title, he claims his rents and profits; and by analogy to the old rule of law governing the action of trespass for mesne profits, limiting the claim to a period of six years before the commencement of the suit, the same rule ought to apply to the commencement of the real action under the revised statutes. And we are of opinion that that was the intent of the limitation expressed in the revised statutes. The statute, in that section, although it contains a limit of six years, yet it fixes no termini, no point of time at which it shall begin or end. Taking the analogy, taking all the provisions as a whole, and the reasons of the commissioners, we are of opinion that the limitation is six years before the commencement of the action, which, since the revised statutes, must be the real action. Then the question recurs, is it to terminate at the commencement of the action, or be brought down to the time of the verdict ?
To say that it shall not be brought down, is to say that when one appeals to the law for redress of the wrong done him, in deforcing him, and unjustly holding him out of his estate, and after a long litigation, during which this holding out continues, the demandant establishes his title, and his *469 right to the possession and enjoyment of the premises, the law will afford him no redress. No such anomaly occurred in the old action of trespass for mesne profits, because the demandant did not commence his action for mesne profits until he had been restored to the possession, and of course to the enjoyment of the rents and profits, so that there was no occasion to recover for rents and profits, during the pendency of that action.
We think that a careful examination and comparison of the provisions of the statute will make this clear. Section 18 prescribes a period of six years, before the commencement of the real action, if the tenant had, for that or a longer time, wrongfully held the premises, as the limit of time, from which the rents and profits should begin to be computed; and as no provision is made for any after action, the computation is to be brought down to the time of the verdict, because the result of the main trial shows conclusively, that during all that time the demandant has been rightfully entitled to the possession and enjoyment of the estate, and all the rents and profits accruing from them, and that during all that time the tenant has received the benefits to which the demandant was entitled. We think, therefore, the rule laid down by the judge for the direction of the jury in this respect, was correct, and conformable to law; and that by the true construction of the statute, the six years therein mentioned, is six years next preceding the commencement of the action. The time during which this rule allowed the rents to be computed in this, was unusually long, because the action remained in court an unusual length of time, about fourteen or fifteen years.
The verdict for the balance of rents and profits, after deducting the amount of betterments, having exceeded the ad damnum, a motion was made by the demandant, for leave to amend his writ so as to enlarge the ad damnum, but the motion was overruled. Whereupon the demandant remitted the excess, and took judgment for the ad damnum.

 Suffolk. Supreme Judicial Court, )
November Term, 1844. j
Andrew Drake vs. John Curtis.
Same vs. Ebenezer Francis.
Tisdale Drake vs. John Curtis.
Same vs. Ebenezer Francis.
These are real actions to recover parcels of wharves and flats near Sea street, in Boston.
The two actions first named were brought by Andrew Drake in his lifetime, and he having died, leaving a will which has been duly proved, and which is made part of this case, whereby he devised the lands and flats in question to the said *446 Tisdale Drake, petitions were presented by the said Tisdale Drake to the court of common pleas, in which the said actions were pending, for leave to appear and prosecute the said actions. The presiding judge ruled pro formá that he had not a right to appear; and upon exceptions to these rulings the cases have been brought to this court. If, upon the argument of the hills of exceptions, this court should be of opinion that Tisdale Drake is entitled to appear and prosecute the said actions, originally brought by Andrew Drake, then the said Tisdale Drake is to be admitted to prosecute the said actions, and the title to the demanded premises is to be tried in those actions, and the said actions brought by Tisdale Drake are to be dismissed with costs ; but if the court should he of opinion that the said Tisdale Drake has not a right to appear and prosecute the said first named actions, they are to be dismissed, and then the said titles are to be tried in the last named actions.
The parties agree to submit the question of title to the court upon such deeds, wills, &c., as they respectively rely on, each party agreeing to furnish to the other party a schedule of the documents he will offer, days at least before the time of trial. And either party, or the court, shall be at liberty to examine the surveyors employed by them, orally.
It is agreed that the court may determine the course of the lines running between high and low water mark, according to the legal rights of the parties, upon the evidence ; and be at liberty to draw all such inferences of fact as a jury would be authorized to draw. If the tenant, in either action, shall elect to do so, he may afterwards submit to a jury any question of adverse possession to bar the demand-ant, or any claim of the tenant for betterments. If either of the said tenants should not so elect, the court is to render a judgment for the demandant or tenant, according to the lines settled by the court. If either of the tenants should so elect, a verdict is to be returned for the demandant for all the land and wharf to which he is entitled, according to the lines fixed by the decision of the court, except such part, if any, from which he is barred by adverse enjoyment; and subject to the amounts to be ascertained and fixed for betterments, if any, by verdict under the usual mode of proceeding when betterments are claimed, and if any claim is made for betterments the demandant may make a claim for rents and profits.
S. Bartlett, for E. Francis.
Choate & Crowninshield, for Curtis.
B. B.. Curtis, for Drake.
“ Drake vs. Curtis. Same vs. Francis.
“July 6, 1846. Wilde, J. The opinion of the court in these cases, as to the principal objection made to the demandant’s title, has been already suggested, and it is not necessary to repeat the reasons on which that opinion was founded. We were of the opinion that the cases must turn on the true location of the true north line of the lot of Jabez Hatch, from whom the tenants derive their title. After this suggestion was made, the tenant’s counsel moved the court to discharge the statement of facts, that the question as to the location of said line might be left to a jury. The question was not much pressed, and there seems to be no good reason *447 why the parties should not be bound by their agreement, as we are not aware of any material fact by which the location is to be determined which is disputed by either party.
“ The principal facts and conveyances on which the tenants rely are not denied, but the question is, whether they prove the direction of the line of Jabez Hatch’s flats. These conveyances prove conclusively that Jabez Hatch claimed to hold by a line running about south sixty degrees east, and that he conveyed by that line to sundry persons under whom the tenants now hold the land in dispute. The entry under these undoubtedly gave a constructive possession of the flats in dispute. But such a possession, though good against a stranger, having no title or previous possession, will not operate as an ouster or disseisin of the true owner. When a disseisor claims to be seised by his entry and occupation, his seisin cannot extend further than his actual and exclusive occupation. 4 Mass. 418. But although these conveyances and claims of title do not amount to a disseisin, they may, if not proved to be founded on a mistake, be good presumptive proof of title. It is incumbent, therefore, on the demandant, to prove that the line, by which Jabez Hatch conveyed these flats, was not the true northerly line of his lot. And this, we think, is satisfactorily proved, and upon the same grounds on which the case of Piper v. Richardson and the previous cases were decided. These cases were considered with great care and attention; and, although the true division of the flats was not ascertained without some difficulty, yet on the whole evidence in those cases we were satisfied that the lots south of Summer street were to be divided by lines parallel with that street. That gave to each proprietor the full width of his lot, and, if so divided, would do equal justice to all; whereas, if Piper’s claim had been established, great injustice would have been done to Richardson, for a greater part of his flats would have been cut off, and the lines of his flats had been so settled that he could not support a claim to the north of Summer street. We are still satisfied that our decisions in these cases were correct, and that this case must be decided on the same grounds; there is no material difference in the evidence Piper proved, in his case, that he had a constructive possession, under a conveyance of an ancient date, and it was then proved that divers proprietors of lots southerly of his claimed by the same direction, and not by lines parallel with Summer street.”