**C. M. FROST et al., Petitioners,**

**v.**

**SOCONY MOBIL OIL COMPANY, Inc.,
et al., Respondents.**

**No. A–11758.**

Supreme Court of Texas.

July 17, 1968.

Rehearing Denied Oct. 2, 1968.

Dissenting Opinion on Rehearing
Oct. 23, 1968.

I. M. Wilford, Houston, Johnson & Dionne, Hart Johnson, Fort Stockton, Crawford Martin, Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., Austin, for petitioner.

Jack T. Akin, Frank C. Ashby, Bullock & Neely, Maurice R. Bullock, Turpin, Smith, Dyer, Hardie & Harman, Irby L. Dyer, Midland, Lawrence & Lawrence, W. Dewey Lawrence, Tyler, Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., Midland, for respondent.

WALKER, Justice.

This is a vacancy case involving land in Pecos County. The tract in question is a rectangle alleged to lie between the east lines of junior Surveys 49 and 50, Block OW, and the west lines of senior Surveys 13, 18 and 19, Block 143. Its north and south lines are 518 and 502 varas in length, respectively, and its east and west lines are some 3400 varas in length. The tract contains 304.51 acres, and the controlling question is whether adjoinder calls in the field

notes of Surveys 49 and 50 are to be disregarded in favor of calls for course and distance.

The suit was instituted by C. M. Frost, petitioner, after his vacancy application was denied by the Commissioner of the General Land Office. Socony Mobil Oil Company, Inc., et al, respondents, who own Surveys 49 and 50, were named as defendants. The Attorney General intervened in behalf of the State as required by Section 6(j) of Article 5421c, Vernon's Ann.Tex.Civ.Stat. After a trial before the court without a jury, judgment was rendered in favor of petitioner decreeing the existence of the vacancy. The Court of Civil Appeals reversed and rendered judgment that the land in question is not vacant, unsurveyed, public land belonging to the State. 407 S.W.2d 248. The State is also a petitioner here and has adopted the application for writ of error filed by C. M. Frost. We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

The field notes of junior Block OW were prepared by O. W. Williams. We began with the stiuation as it existed at the time he did his work. The field notes of senior Blocks 106, 114, 115, 142, 143, 146, 203 and 203½ were prepared by L. W. Durrell. Their locations with respect to each other and with respect to certain surveys senior to Durrell are shown on Plat No. 1 below:

PLAT NO. 1

The surveys shown on Plat No. 1 that are senior to Durrell's work are the Peter Gallagher, where the town of Fort Stockton is located, and Surveys 242, 254, 255 and 541 near the southwest corner of the plat. In so far as relevant here, Durrell's field notes of Block 146 call for tiers of six sections running from east to west, with each section 1900 varas square and the east line of the block fixed as an extension of the west line of the Peter Gallagher Survey. Permanent monuments were set at some of the section corners as shown on the plat, but the west line of the block was not monumented. This line as well as most of Durrell's other lines were located by office work only.

Blocks 114, 106, 115, 142 and 143 were located by Durrell in substantially the same manner. He marked certain survey corners on the east side and near the center of each block with stone mounds, which are described and called for in his field notes. These monuments and those in Block 146 are still there. The only work done on the ground in locating the six blocks, however, was in the east portion of the blocks where the stone monuments were set. No work was done on the ground within the west two tiers of any of the blocks, and Durrell's location of these sections was by projection or office work only.

Two years after Durrell did his work in the six blocks mentioned above, he prepared the field notes for Block 203. This was an office survey built on the unmarked office-surveyed west line of Block 146. Survey 3, Block 203, was given an east-west width of 992 varas. Shortly thereafter Durrell prepared field notes, also by office survey, for Block 203½, consisting of Surveys 1 and 2. The west line of Survey 1 was located by office calls 500 varas west of the west line of Survey 3, Block 203. The field notes of Survey 2, Block 203½, are quoted in the margin.[1] It will be noted that the northwest corner of this survey apparently was intended to be 500 varas west of the west line of Block 142, and its lines are called to run thence south to the northwest corner of Survey 1, and thence east 500 varas to the place of beginning.

Durrell made two mistakes that are material here. In the first place, he incorrectly assumed that the west lines of Blocks 142 and 143 were in the same meridian as the west lines of Blocks 115 and 106. The ground position of the west lines of Blocks 142 and 143 is about 100 varas east of the extended west lines of Blocks 115 and 106. There is a problem then, not presented for decision here, as to how Survey 2, Block 203½, should be placed on the ground. The significant fact from the standpoint of the present controversy is that the extended west line of Survey 1, Block 203½, is some 600 varas west of the west lines of Blocks 142 and 143 rather than 500 varas as Durrell supposed. In the second place, Durrell was mistaken as to the location of Surveys 242, 254, 255 and 541, which were senior to his work. The calls for courses, distances and adjoinder in his field notes of Surveys 2 and 3, Block 203, and Survey 1, Block 203½, show that he thought the relative location of Block 146 on the one hand and Surveys 242, 254, 255 and 541 on the other was as indicated on Plat No. 2 below. The ground position of Surveys 242, 254, 255 and 541 is several hundred varas north and a short distance east of where Durrell thought they were when he wrote his field notes for Blocks 203 and 203½. If effect were given to his calls for course and dis-

1. Beginning at a stake and mound at the North East corner of Survey No. 1, Block 203½, * * *; thence North 670.3 varas to the North West corner of Survey No. 1, Block No. 115 * * *; Thence East 1782.7 varas to * * * the South West corner of Survey No. 5, Block 203; thence North 667½ varas to a stake and mound; thence West 1782.7 varas to the South West corner of Survey No. 6, Block 142 * * *; thence North 10722.3 varas to a stake and mound for the North East corner of this Survey; thence West 500 varas to a stake and mound for the North West corner of this Survey; thence South 12060.1 varas to a stake and mound at the North West corner of Survey No. 1 this block for the South West corner of this Survey; thence East 500 varas to the place of beginning.

tance, Survey 3, Block 203, and Survey 1, Block 203½, would overlap Surveys 242 and 255 as shown by the dotted lines on Plat No. 3.

This was the situation when Williams prepared his first set of field notes for Block OW in 1884 and 1885. Block OW lies west of and was called to adjoin the west lines of Blocks 203½, 142 and 143. The first work done by Williams in Block OW was in the east tier, which is some 19 miles long and consists of 14 surveys numbered from south to north as follows: 1, 2, 3, 5, 6, 7, 8, 10, 12, 14, 16, 49, 50 and 56. The original field notes for the south 11 surveys in the east tier are dated December 15 and 20, 1884. They call for only three monuments, the rock mounds placed by Williams at the northwest, southwest, and lower southeast corners of his Survey 1. The original field notes for Surveys 49, 50 and 56 were done on April 23, 1885. Prior to that date Williams had prepared field notes for a number of surveys in the adjoining tier to the west. The field notes of the latter surveys show that by the time they were written, Williams had monumented the west line of the east tier of Block OW with a substantial number of monuments extending from the southwest corner of Survey 1 to a point just south of the northwest corner of Survey 10. Williams was never on the ground north of his Survey 10, however, and he made no attempt to locate any of Durrell's monuments.

The course and distance locations of the east tier of Block OW with respect to Blocks 203½, 142 and 143 according to Williams' original and corrected field notes are shown on Plats Nos. 4 and 5 below, respectively, with adjoinder calls indicated by arrows:

The following are Williams' original field notes of his key Survey No. 1:

"Beginning at a stake and mound at the N.W.cor. of Survey No. 255 * * * ; thence S. 86 E. 316 varas along the north line of said Survey to the S.E.cor. of Survey No. 1 * * * ; thence North at 457 vs. pass'g S.W.cor.Sur. 1, Block 203½, 3219 vs. to a point in the west line of said Sur. No. 1; thence west 1900 varas to a stake and large stone mound for N.W.cor. of this Survey; thence south 3890 varas to a stake and mound of small stones in the north line of Sur. 541 for S.W.cor. of this Survey; thence South 86 East 1530 vs. to 2 large stones * * * at N.E.cor. of said Sur. No. 541; thence N. 4 E. 788 varas to the place of beginning."

A comparison of these field notes with Plat No. 2 will show how Williams was misled by Durrell's theoretical but mistaken field-note relationship between Survey 255 and Survey 1, Block 203½. This is also borne out by the sketch Williams placed at the top of the original field notes for his Survey 1. Durrell had called for the most westerly southwest corner of Survey 2, Block 203, to be in the north line of Survey 255, 528.4 varas from its northeast corner. The north line of Survey 255 was called to be 1344 varas in length, and the called width of Block 203½ was 500 varas. By subtracting 1028.4 (528.4 plus 500) from 1344, Williams concluded that a point in the north line of Survey 255, 316 varas from its northwest corner would be due south of the southwest corner of Survey 1, Block 203½.

The upper southeast corner of Survey 1, Block OW, was in the north line of Survey 255, but was located by a call for distance only, 316 varas from the northwest corner of Survey 255. This is the southern terminus of the east line of Block OW according to the original field notes. From that point the line ran north, with a passing call for the southwest corner of Survey 1, Block 203½, at 457 varas, a total distance of 3219 varas "to a point in the west line of said

Survey No. 1." The passing call was an impossibility, because the field-note location of the southwest corner of Durrell's Survey 1, Block 203½, was not north of the north line of Survey 255 but a considerable distance south of it.

The original field notes of Survey 2, Block OW, called to begin at the northeast corner of Survey 1, Block OW, and for adjoinder with the west line of Block 203½. Every survey to the north was constructed in the same manner, i.e., by beginning at the northeast corner of the survey to the south and calling for adjoinder with the west line of Block 203½, until Williams reached, in his office work on Survey 14, what he thought was the north end of Block 203½. At that point he turned east and called for a distance of 500 varas and for adjoinder with the west line of Block 142. He did this because Durrell's field notes called for Block 203½ to be 500 varas wide at the north end for it to adjoin the west line of Block 142. Surveys 16, 49, 50 and 56 were each built on the northeast corner of the survey to the south and called to adjoin Durrell's Blocks 142 and 143.

At the time Williams wrote his original field notes, Durrell's lines which he called to adjoin were not marked on the ground. The west line of Block 203½ when properly located by reference to Durrell's monuments, was less than 316 varas from the northwest corner of Survey 255. This is conceded by all parties. The east tier of Block OW, if placed on the ground in accordance with the original field-note call of 316 varas from the northwest corner of Survey 255, conflicted with senior Block 203½ at the south end. As a result of divergence between Durrell and Williams which will be explained later, this course and distance conflict feathered out at a point in the east line of Survey 6, Block OW. From that point north, if effect were given to calls for course and distance, there was a constantly widening vacancy between Block OW and Blocks 203½, 142 and 143.

In July, 1885, shortly after completing his original field notes for Block OW, Williams measured the distance on the ground between the southeast corner of Survey 254 (immediately south of Survey 255) and the northwest corner of the Peter Gallagher Survey at Fort Stockton. On the basis of the information thus obtained, he concluded, (1) that Survey 1, Block 203½, was not north of but was in conflict with Survey 255; and (2) that the aggregate of the field-note distances called for by Durrell in Blocks 146, 203 and 203½ would place the intersection of the west line of Block 203½ with the north line of Survey 255 at a point 34 varas from the northwest corner of Survey 255; and (3) that there was a 282-vara conflict between the east tier of Block OW, when located by calls for course and distance in his original field notes, and the west line of Blocks 203½, 142 and 143.

On the basis of his calculations and without locating Durrell's monuments, Williams corrected the field notes of every survey in the east tier by moving the east line either 282 or 284 varas to the west. He first corrected his field notes for Surveys 49, 50 and 56 at the north end, and in each instance reduced the east-west calls by 284 varas. The corrected field notes call for 2116 varas from the west line to the east line instead of the original 2400 varas. In the surveys to the south, which he later corrected, the east-west calls were reduced by 282 varas. For example, the north line of Survey 1, Block OW, was called to be 1618 varas in the corrected field notes instead of the original 1900 varas.

The north-south calls were also changed in every survey except Surveys 1, 7 and 8. Surveys 49 and 50 had been surveyed by virtue of Certificate No. 96 for 640 acres issued to Texas Trunk Railroad Company by the Commissioner of the General Land Office. In his corrected field notes of Survey 49 Williams increased the south-north distance from 1504 to 1706 varas, thus compensating for the reduction in the east-west dimension and giving the railroad approximately the 640 acres to which it was en-

titled. The identical change was made in the dimensions of twin Survey 50 for the School Fund. Survey 49 was patented and Survey 50 was awarded on Williams' corrected field notes as follows:

### SURVEY 49

"Beginning at a stk & md at N.W. cor of Sur. No. 16 of this Block * * *; thence East 2116 varas to stk & md in West line of Survey No. 13, Block 143, * * * for S.E. cor of this Survey; thence North at 734½ varas pass'g the N.W. cor. of said Survey No. 13, Block 143, 1706 varas to stk & md in West line of Survey No. 18, Block 143 for N.E. cor. of this Survey; thence West 2116 varas to stk & md in East line of Survey No. 51 of this Block * * *; thence South, at 413 vs. pass N.E. cor. Sur. No. 47 of this Block, 1706 varas to the place of beginning."

### SURVEY 50

"Beginning at a stk & md for N.W. cor. of Sur. 49 of this Block * * *; thence East 2116 vs. to stk & md in West line of Sur. 18, Bl. 143 & at N.E. cor. Sur. No. 49 of this Block * * *; thence North at 928½ vs. pass'g N.W. cor. Sur. 18 & S.W. cor. Sur. 19, Bl. 143, 1706 vs. to stk & md in the West line of said Survey No. 19, Bl. 143 * * *; thence West 2116 varas to stk & md for N.W. cor. of this Survey; thence South at 219 vs. pass'g N.E. cor. Sur. No. 51 of this Block 1706 varas to the place of beginning."

The corrected field notes call for the monuments Williams had placed along the south portion of the west line of his east tier, and each survey north of Survey 1 was called to begin at the northwest corner of the survey to the south. The east tier was thus tied to its monumented west line. As indicated by Plat No. 4 above, the east line of the corrected east tier, if located by calls for course and distance does not reach the west lines of Blocks 203½, 142 or 143 at any point. The discrepancy amounts to 518

varas at the north line of Survey 50 and 502 varas at the south line of Survey 49.

The south 320 acres of Survey 1, Block 203½, was patented in 1914 on field notes prepared in 1911 by A. N. Lea, County Surveyor of Pecos County. According to these field notes, the survey was given a width of 600 rather than 500 varas and its west line was located at the southeast corner of Survey 1, Block OW, identified as a stake 34 varas South 86 East from the northwest corner of Survey 255. Other surveys and a number of patents covering different parts of Block 203½ have attempted to hold the east line of Block OW to its called distance 1618 varas from Williams' monumented west line and to place in Block 203½ the gap left by Williams' calls for course and distance. The patent to the south part of the north portion of Survey 1, Block 203½, calls for the east lines of Surveys 2 and 3, Block OW, to be 1618 varas east of and parallel with their west lines, and shows Block 203½ to be 691.6 varas wide. The patent to the north 295 acres of the south 320 acres of Survey 2, Block 203½, calls for the east line of Block OW to be 790 varas west of the west line of Block 115. On the other hand, Surveys 56, 16 and the north part of Survey 14, Block OW, have been patented on field notes prepared after Williams did his work and which call for an east-west distance of more than 2600 varas and for adjoinder with Block 143.

Williams' adjoinder calls have thus been honored by the State in several instances and disregarded in others. Lea, who mapped the entire area, showed the gap left by the calls for distance in the field notes of Block OW but did not report a vacancy to the General Land Office. It also appears that Sections 49 and 50 are fenced and occupied in an adjoinder position, and the owners of the two sections have placed improvements on the tract now in controversy.

■ We recognize the general rule that calls for adjoinder will ordinarily prevail over calls for distance. See Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W. 2d 801; 129 Tex. 547, 104 S.W.2d 1; Cross v. Wilkinson, 111 Tex. 311, 234 S.W. 68. This is so even where the call is for adjoinder with the unmarked but ascertainable lines of an adjacent survey. See Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773; Maddox v. Turner, 79 Tex. 279, 15 S.W. 237; Phillips Petroleum Co. v. State, Tex.Civ.App. 63 S.W.2d 737 (wr. ref.). There is, however, an important exception to the general rule, and petitioners insist that the present case is governed by the exception. When it appears that the call for adjoinder was made through mistake, it may be disregarded and the matter is set at large with the court left free to construct the survey in such manner as will best give effect to the intention of the parties as determined from the entire description when read in the light of the surrounding circumstances. Stanolind Oil & Gas Co. v. State, supra; Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792; Boon v. Hunter, 62 Tex. 582; State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228.

■ Respondents are correct in saying that a mistaken or conjectural adjoinder call is not necessarily shown by mere variances in distance. Camp v. Gulf Production Co., supra. As pointed out in State v. Sullivan, supra, an "inconsiderable excess is not of itself evidence that the surveyor was mistaken in the location of the adjoinder for which he called, but, when there is no other evidence of mistake, is usually * * * taken to mean that the mistake was in the measurement or in the calculation of the distance." See also Giles v. Kretzmeier, Tex.Civ.App., 239 S.W.2d 706 (wr. ref. n. r. e.). In this instance variances in distance are not the only evidence of mistake.

Both Durrell and Williams are now dead. Durrell, when he called to run north, is shown by his monuments to have run North 13' East and in some instances North 18' East, whereas Williams is shown by his monuments to have run North 15' West.

Respondents' witness Cool determined by triangulation that the ground distance between the southeast corner of Survey 254 and the northwest corner of the Peter Gallagher Survey was 12,017 varas. Williams had concluded from his measurements that this distance was 11,962 varas. Cool also testified that he found an excess of 40 varas between the northwest corner of the Peter Gallagher Survey and Durrell's monument at the southwest corner of Survey 20, Block 146. Lea's 1913 map mentioned below shows an excess of 10.1 varas between the monuments he found at the southeast and southwest corners of Section 41, Block 146. Respondents say that this excess offsets all of Williams' excess except about 5 varas. They then argue that the discrepancy of from 502 to 518 varas in the distances called for the east-west dimensions of Surveys 49 and 50 is due entirely to an error of perhaps 5 varas at the upper southeast corner of Survey 1, Block OW, plus the mechanical errors of Williams and Durrell in their departures from true north.

The record shows that Lea did considerable surveying in the area. Lea also is dead, but he filed with the General Land Office a number of maps showing the results of his work. A map filed in 1913 shows that he located a number of Durrell's monuments in Block 146 and found an excess of 63.7 varas between the southwest corner of Section 21 and the northwest corner of the Gallagher Survey. The map also shows that he gave Sections 15 and 16 each an east-west excess of 10.1 varas, but we do not attempt to determine whether there is any legal basis for his doing this.

Another map filed by Lea in 1929 shows that he located Williams' monuments on the west line of the east tier of Block OW. It further appears from such map that Lea ran several lines of connection, including one 3302.4 varas in length from the monument at the northwest corner of Survey 1, Block OW, to the west line of Block 146. This exceeds by 192 varas the aggregate of: (1) the 1618 varas called by Williams, and

(2) Durrell's field-note distance of 1492 varas across Blocks 203 and 203½. Although the facts have not been fully developed concerning the ground location of the west line of Block 203½ where it intersects the north line of Survey 255, it is our opinion that the trial court could reasonably conclude from the present record that the course and distance location of the upper southeast corner of Survey 1, Block OW, is 100 or more varas west of the west line of Block 203½.

■ Respondents are also incorrect in saying that the discrepancy between the actual and called distances from the west lines of Surveys 49 and 50 to the west line of Block 146 is due almost entirely to the mechanical errors of the two surveyors in departing from their called courses. If this were true, we would have an entirely different case. A constant aggregate departure of 30 minutes would cause a divergence of approximately 16½ varas to the mile or a total of some 313 varas over the distance of about 19 miles from the southwest corner of Survey 1 to the northeast corner of Survey 50. When the evidence is considered in the light most favorable to petitioners, it appears that the gap with which we are now concerned was caused by three factors: (1) the west line of Block 203½ is a substantial distance east of where Williams thought it was when he wrote his corrected field notes; (2) the mechanical errors of the two surveyors in departing from their called courses; and (3) the fact that the west lines of Blocks 142 and 143 are some 100 varas east of the extended west lines of Blocks 115 and 106. In any event the evidence is conclusive that Williams was mistaken as to the location of the west lines of Blocks 142 and 143, and that his calls for adjoinder with such blocks in the corrected field notes of Surveys 49 and 50 were made through mistake. This is the only reasonable conclusion when he shortened his north and south lines 284 varas instead of extending them more than 200 varas as would have been

necessary to accomplish the adjoinder he obviously intended.

The question to be decided then is the manner in which the two surveys should be constructed so as to best carry out the intention of the parties. Petitioners rely primarily on Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792; Wheeler v. Stanolind Oil & Gas Co., 151 Tex. 418, 252 S.W.2d 149; and Humble Oil & Refining Co. v. State, Tex.Civ.App., 104 S.W.2d 174 (wr. ref.). We agree with respondents that *Wheeler* is not helpful, because the line of the junior survey there in question was monumented on the ground. The closest of the three cases on the facts is *Humble,* where the State claimed as vacant a gap left by the course and distance calls in the corrected field notes of a junior survey.

A certificate for 640 acres was issued to the International & Great Northern Railroad Company, and was located in Harris County and surveyed by Gillespie. The original field notes called for a section 1900 varas square adjoining the G. Lamb Survey on the south and the Hooper and Goodrich Surveys on the north. These field notes were rejected by the Land Commissioner, and Gillespie then prepared corrected field notes in which the north-south distances were changed from 1900 varas to 1595 varas. The corrected field notes continued to call to begin at the northwest corner of the Lamb Survey and for adjoinder with the Hooper and Goodrich Surveys. Patent was issued on the basis of the corrected field notes for 537 acres, and the remaining 103 acres of the certificate was floated and located in another county.

It was contended there, as here, that since there was no uncertainty as to the location of the south lines of the Hooper and Goodrich Surveys on the ground, the calls for adjoinder with such lines should control the calls for course and distance. The argument was rejected and the adjoinder calls were disregarded. In holding that the survey should be constructed on the basis of the calls for course and distance, the court said:

"It is true that there is now no uncertainty as to the location of the south lines of the Hooper and Goodrich Surveys, but the evidence fully supports the finding of the court that the south lines of these surveys were open unmarked prairie lines, and that the southwest and southeast corners of both of said surveys were never marked, except by stake and mounds in the prairie, which cannot now be found and identified; and that all were indefinite and uncertain, both on the ground and in the records of the Land Office when the survey and corrected field notes of the International & Great Northern survey were made by Gillespie in 1877–78. But even if the location of the south lines of the southwest and southeast corners of the Hooper and Goodrich were marked on the ground, or could have been located under some applicable rule at the time the International & Great Northern survey was made, still the adjoinder rule of boundary has no application to the instant case, because the adjoinder rule has no application where the facts conclusively show that the surveyor through mistake or conjecture called for the adjoinder, and in such cases the call for adjoinder does not control the call for course and distance, even though the line or corner called for was marked * * *.

" * * * This demonstrates that Gillespie did not know where the south lines of said Hooper and Goodrich were when he made his survey of the International & Great Northern survey and returned his corrected field notes in 1878; and manifestly a call for a survey line, whether marked or unmarked, will not control a call for course and distance, where it clearly appears that the surveyor did not know where the line was. * * * Manifestly, the surveyor and the parties to the grant had a purpose in view when the distances of the east and west lines of the International & Great Northern

survey were shortened 305.8 varas, and the acreage reduced from 640 to 536 and a fraction, and that such purpose was to rebuild the International & Great Northern survey so as to not supposedly conflict with the south lines or portion of the Hooper and Goodrich surveys. Manifestly the parties did not intend to cover exactly the same land by the original as by the corrected field notes. If that were true, then there would have been no necessity for the corrected field notes, which shortened the east and west lines and reduced the acreage. Keyser v. Meusback, 77 Tex. 64, 13 S.W. 967. So, when all of the above-mentioned facts and matters are construed or considered together, the course and distance calls of the east and west lines of the corrected field notes of the International & Great Northern survey, which coincide with quantity and configuration of the survey as patented, more clearly and certainly reflect the intention of the parties to the grant than does the call for the south open prairie lines of the Hooper and Goodrich surveys."

There were a number of boundary problems in *Turner,* but the one that is of particular interest here concerned the location of the west line of the Yates Survey, which was surveyed and patented on an application covering all of the vacancy between the east line of Block. 194 and the west line of a block of railroad surveys fronting on the Pecos River. The field notes were prepared by R. S. Dod and called to go west an insufficient distance to reach the east line of Block 194 but had a substantial number of adjoinder calls for Block 194. Turner applied for a vacancy between the west line of the Yates Survey and the east line of Block 194. It was his contention that the Yates Survey should be constructed in accordance with the calls for course and distance, while those who owned the Yates Survey took the position that the calls for adjoinder with senior Block 194 should control.

Block 194 had been put in by L. W. Durrell in 1883 as an office survey. The field notes of his western tier called to begin at the northeast corner of Block Z, which had been surveyed on the ground, and for adjoinder with the corners and east lines of the east tier of sections in Block Z. The remainder of Block 194 was then platted in from west to east, and the southern tier of sections was called to adjoin the unmarked and unsurveyed line of Block 178.

Durrell had previously put in Block 178 as an office survey, calling for its southernmost sections to adjoin Blocks C–3 and C–4. This was the situation when Yates applied for all of the vacancy between Block 194 on the west and the railroad surveys on the east. Dod at first located the east line of Block 194 on the basis of the accumulated field-note calls from west to east. After filing his initial report, however, he was instructed by the Commissioner of the General Land Office to bring into Block 194 any east-west excess found in Blocks C–3 and C–4. Dod found an excess of 301 varas between the southeast corner of Block Z and an unmarked mound which he accepted as the southwest corner of Survey 6, Block C–3. He brought this excess into Block 194 as instructed, and accordingly concluded that the east line of Block 194 was 301 varas east of where he had previously located it. The field notes for .the Yates Survey were then prepared, calling for east-west distances conforming to the east line of Block 194 if placed in the ground position last mentioned but also calling for adjoinder with such line.

Before reaching the question with which we are primarily concerned, the Court disposed of several other problems. It held that the north-south excess in Block Z as shown by original monuments on the ground should be prorated between the several tiers of Block Z and then carried eastward into Block 194. This latter conclusion appears to be entirely sound when Durrell had called for adjoinder as he did and there was nothing to suggest a mistake on his

part except the excess distance in Block Z. It was also held that the east line of Block 194 should be located in accordance with the accumulated calls for course and distance, and without regard to any excess ·in Blocks C–3 and C–4. Since this was where Dod had located such line in the first instance, the Court concluded that his adjoinder calls in the field notes of the Yates Survey should be disregarded and the survey constructed on the basis of the calls for course and distance. It reasoned that:

"The field notes and sketch of the , Yates survey prepared by the surveyor show clearly where he placed the west line of the survey. When we look to his declarations in his reports of progress, it becomes more clear than ever the exact position at which this line was placed. Not only does the position at which he placed it not admit of any doubt, but these reports show the reason which caused him to so place it. Furthermore, the field notes calls for course and distance in the Yates survey place the west line of this survey in the exact position at which Dod located the east line of block 194 under instructions of the land commissioner. The computation of acreage upon these field notes calls shows there to be 2,486 acres, the exact amount applied for and purchased by Yates. Thus, it is clear that, when Dod called for the east lines of surveys 33, 32, 31 and 30 in block 194, he was calling for those lines as he had erroneously fixed them. Under this construction, which is certainly what the surveyor actually did, all the calls in the Yates patent are harmonized, and, as stated by Associate Justice Greenwood in the case of Wilson v. Giraud, 111 Tex. 253, 231 S.W. 1074: 'The latter construction is reasonable, and, since it harmonizes all the terms of the patent, it must be adopted under the general rule for the interpretation of written instruments.' "

Respondents cite Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773, and Phillips Petroleum Co. v. State, Tex.Civ. App., 63 S.W.2d 737 (wr. ref.). As we pointed out in State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228, there was no evidence of mistake in *Camp* except an inconsiderable excess of some 35 varas to the mile. The excess was more substantial in *Phillips* but constituted the only circumstance tending to show mistaken or conjectural adjoinder calls, and it appeared that the junior surveyor there had located a number of corners of surveys in the block he called to adjoin.

Respondents also say that *Humble* and *Turner* are to be distinguished on the facts. They point out that in *Humble* a call for the northwest corner of the Senechal Survey which appeared in the original field notes was deleted from the corrected field notes. The junior surveyor in *Turner* was on the ground and was shown by his monuments to have first located the east line of Block 194 where this Court eventually decided it should be located. He then rejected that location and wrote his field notes to call for adjoinder with the line in an entirely different position. Here Williams' corrected field notes of Surveys 49 and 50 are based on office surveys. In the case of Surveys 49 and 50, he did not survey on the ground to some point which he mistakenly supposed was the west line of Block 143; he did not find anything that he erroneously believed was the west line of the senior block. Since he was surveying by projection, he simply calculated the distances which he thought would be necessary to reach the line he wished to adjoin.

In our opinion these factual differences do not constitute a sound basis of distinction. Williams was no less mistaken as to the ground location of the line he called to adjoin than were Dod and Gillespie. Instead of moving his east line to the east as would have been necessary to effect an adjoinder, he reconstructed the twin surveys by decreasing the east-west distances and increasing the north-south distances. A 202–vara strip that had originally been included in Survey 50 was taken into Survey 49, and a 404–vara strip originally included in Survey 56 was added to Survey

50. Our problem cannot be solved then by saying, as was done in *Phillips,* that if Williams had known the correct distance between his west line and that of Block 146, he would have called for it. It is equally clear that if he had known the facts concerning such distance, he would have decreased his north-south dimensions instead of increasing them.

After correction of his field notes for Surveys 49 and 50, the called dimensions of each rectangle substantially satisfied the 640-acre certificate of the railroad. We are convinced that neither the surveyor, the State nor the railroad intended that the rectangle constituting Survey 49 should have dimensions of 1706 varas by over 2600 varas and an area of 785 acres. While there is ample evidence that Williams intended for his Block OW to adjoin Block 146, this is generally true in any case where an ambiguity arises from inconsistencies in calls for distance and mistaken or conjectural calls for adjoinder. In this instance, moreover, it is plain that Williams was attempting to effect adjoinder with a line he thought was approximately 2116 varas, and certainly less than 2400 varas, from his west line.

■ Paraphrasing the language of the court in *Humble,* the surveyor and the parties had a purpose in view when the distances of the north and south lines were shortened and the distances of the east and west lines lengthened so as to embrace approximately the 640 acres to which the railroad was entitled. That purpose was to rebuild the surveys so as to eliminate a supposed conflict with the west portion of Block 143. Manifestly the parties did not intend for the corrected field notes to extend as far east as, or to cover more acreage than, the original field notes. The rectangles described in the corrected field notes contain almost exactly the same number of square varas as those described in the original field notes. When all of the facts and circumstances are considered, it is our opinion that the course and distance

calls more clearly and certainly reflect the intention of the parties than do the mistaken calls for the unmarked line which Williams did not even attempt to locate on the ground.

Although respondents argue to the contrary, our decision in this case does not necessarily mean that there is a vacancy 19 miles long extending from the upper southeast corner of Survey 1, to the northeast corner of Survey 56. We have already pointed out that there is a question as to how Survey 2, Block 203½, is to be placed on the ground. When this question is resolved and the facts concerning the ground location of the southwest corner of Survey 1, Block 203½, have been developed, it may appear that any gap between the east line of Block OW, when located by calls for course and distance, and the west line of Block 203½ is due, as contended by respondents, to a minor error at the upper southeast corner of Survey 1, Block OW, plus the divergence of the lines of the two surveyors. Any case involving those facts will be decided when it arises. It should also be observed that we are not here called upon to decide and do not consider or attempt to decide the effect of the resurveys and patents of Surveys 14, 16 and 56, Block OW, and of the land in Block 203½. We do hold that there is a vacancy between the east lines of Surveys 49 and 50, Block OW, when properly located on the ground in accordance with Williams' calls for course and distance, and the west line of Block 143.

The judgment of the Court of Civil Appeals is accordingly reversed, and that of the trial court is affirmed.

Dissenting opinion by SMITH, J., in which GRIFFIN and HAMILTON, JJ., join.

SMITH, Justice (dissenting).

I respectfully dissent.

In this vacancy suit, the land involved, located in Pecos County, is a tract, 3412

varas long, North and South, by 510 varas, West to East.

Petitioner, Frost, claims that the strip of land adjoins the East line of Sections 49 and 50, Block OW, and lies West of Block 143. The respondents contend that the land claimed as a vacancy adjoins Block 143, therefore, no vacancy.

Frost does not agree with the Court of Civil Appeals that "the parties are in agreement that there are no material and controlling facts which are in dispute; that the determination of the appeal is based solely on the application of law to such undisputed facts." However, the State of Texas, an appellee along with Frost, stated in its brief in the Court of Civil Appeals that there was "very little dispute as to the facts, perhaps none as to any essential facts." Frost did not disagree with this statement.

Frost now contends in his original application for writ of error that this is "clearly a case in which reasonable minds might differ as to the ultimate fact issues, fact issues impliedly found by the Trial Court and supported by the evidence, and implied findings which the * * * Court of Civil Appeals erroneously set aside and for which it substituted its own findings."

Frost claims that the fact issues arose from an ambiguity in the field notes for Sections 49 and 50, Block OW. Frost further contends that "The ambiguity in the corrected field notes of Sections 49 and 50 created by the conflict between their calls for distance and adjoinder is a *latent ambiguity which is not apparent until an attempt is made to locate them on the ground.*" (Emphasis added.) This, in turn, according to Frost, creates two questions of fact: (a) Whether Williams called for the West line of Block 143 under a mistaken belief or supposition as to the places on the ground where such senior line was located, and (b) if question (a) is answered in the affirmative, whether the construction of Sections 49 and 50 by their corrected calls for course and distances or by the

calls for adjoinder would best give effect to the intentions of the parties as expressed in the instruments pertaining to the two sections, considered in the light of the facts and circumstances surrounding such instruments. Frost says these two fact questions were resolved by the trial Judge in favor of Petitioner's contention that the course and distance calls control. This Court, in effect, has agreed.

Frost claims the Court of Civil Appeals' decision conflicts with the cases of Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792 (1933), and Humble Oil & Refining Company v. State, 104 S.W.2d 174, (Tex.Civ. App.1936, writ ref'd). Later in this opinion, I will attempt to show why the holdings in these cases are not controlling. Frost points out that in each case, the Junior Surveyor's call for adjoiner with an unmarked senior line was the result of his mistaken belief as to the location on the ground of the line he called to adjoin. In each case the course and distance calls gave the patentee the area to which the patentee was entitled, and in each case the patentee accepted the patent under the corrected notes. Upon this basis, Frost argues that since there is no factual difference between this case and *Turner* and *Humble,* the ultimate result in our case is controlled by these two cases.

Frost, in his brief filed in this Court on November 21, 1967, attempts to simplify the problem. He reduces the points from twelve to two major contentions, which are to the effect that there is evidence in the record to sustain the findings and judgment of the District Court that a vacancy existed, as claimed by him, and that the Court of Civil Appeals erred in holding that Surveys 49 and 50, Block OW, were to be located by giving effect to the adjoinder calls in the description of those surveys, rather than the calls for course and distance.

In this latter brief, Frost candidly agrees that, "The vacancy does not exist if the calls for adjoinder between the East line of

those surveys and the West line of senior Block 143 to the East are honored."

The Court has declined to honor the adjoinder calls embraced in the description of Surveys 49 and 50, Block OW. To the contrary, the Court, although recognizing the general rule that calls for adjoinder will ordinarily prevail over calls for distance, chooses to invoke an exception to this rule. The exception is stated, as follows: "When it appears that the *call for adjoinder was made through mistake,* it may be disregarded and the matter is set at large with the Court left *free to construct the survey* in such manner as will best give effect to the intention of the parties as determined from the entire description when read in the light of surrounding circumstances." (Emphasis added.) After stating the exception which controls its decision that a vacancy exists, the Court proceeds to designate several mistakes claimed to have been made by the Senior Surveyor, Durrell, which caused Williams to be mistaken as to the location of the West lines of Blocks 142 and 143, thus leading to Williams' mistaken calls for adjoinder with such blocks—the corrected field notes of Surveys 49 and 50. These so-called "mistakes" will be discussed in more detail later in this opinion. The Court concludes that it would be unreasonable to hold that Williams was not mistaken as to the location of the West lines of Blocks 142 and 143 in view of the fact that he "shortened his North and South lines 284 varas instead of extending them more than 200 varas as would have been necessary to accomplish the adjoinder he obviously intended."

The purpose of this dissent is to show that the general rule that calls for adjoinder in the description of Surveys 49 and 50 should be controlling under the facts of this case. In order to accomplish my purposes, it is not necessary to disprove the position of Frost that the facts are so similar to those in *Turner,* supra, and *Humble,* supra, that the Court has no alternative but to hold that a vacancy exists. In order to quickly focus attention to the view of the dissent, sketches of the area involved are inserted in this dissenting opinion. The principal sketch is a copy of the one annexed to respondents' reply brief filed in this Court on December 11, 1967, and referred to herein as Sketch No. 1. This sketch will be used chiefly in connection with resolving the question of whether or not a vacancy exists East of Surveys 49 and 50, or to be, perhaps, more accurate, the sketch will be helpful in resolving the question of whether adjoinder calls in the field notes of Surveys 49 and 50 are to be disregarded in favor of calls for course and distance.

Sketch No. 1

This case was tried to the Court without a jury. No findings of facts nor conclusions of law were either requested of the Trial Court or filed by that Court. Furthermore, the judgment contains no findings supporting its conclusion that the tract of land involved here is a vacancy. The position taken in this dissent is that the calls for adjoinder in the description are more certain and are of greater dignity than the calls for courses and distances, and because of this fact, there is no evidence showing that a mistake which would justify abandoning the general rule was made. A proper construction of the field notes leads but to one conclusion which should be that Surveys 49 and 50, Block OW, are to be located by their respective adjoinder calls for the senior surveys to the East. The complete, corrected field notes by Williams of Surveys 49 and 50 are set out in the Court's opinion. However, it is sufficient for the purposes of this dissent to, at this juncture, state the adjoinder calls, which are as follows:

Survey 49:

"THENCE East 2116 varas to stake and mound in West line of Survey 13, Block 143, Texas & St. Louis R R Co. Surveys—for Southeast corner of this survey—

"THENCE North at 734½ varas passing the Northwest corner of said Survey No. 13, Block 143—1706 varas to stake and mound in West line of Survey No. 18, Block 143, for Northeast corner of this survey—."

and from the field notes of Survey 50, the adjoinder calls are:

"THENCE East 2116 varas to stake and mound in West line of Survey 18, Block 143, and at Northeast corner of Survey No. 49 of this block for Southeast corner of this survey—

"THENCE North at 928½ varas passing Northwest corner Survey 18 and Southwest corner Survey 19, Block 143–1706 varas to stake and mound in West line of said Survey 19, Block 143—for Northeast corner this survey—"

Necessarily, this dissent must present in some detail the controlling facts which afford the basis of disagreement with the findings of fact contained in the Court's opinion.

It is my position that the West lines of the senior Surveys 142 and 143 were capable of definite ascertainment, at all times, and that Williams, the surveyor of the East tier of Block OW at the time of preparation of the corrected field notes, knew with reasonable certainty the location on the ground of the West lines of the senior Durrell Surveys.

The Court bases its decision in part upon its finding that Durrell incorrectly assumed that the West lines of Blocks 142 and 143 "were in the same Meridian as the West lines of Blocks 115 and 106", and its further findings that "Durrell was mistaken as to the location of Surveys 242, 254, 255 and 541, which were senior to his work. The calls for courses, distances and adjoinder in his field notes of Surveys 2 and 3, Block 203, and Survey 1, Block 203½, show that he (Durrell) thought the relative location of Block 146 on the one hand and Surveys 242, 254, 255 and 541 on the other hand was as indicated on Plat No. 2." (Court's opinion, p. 390.) "If effect were given to his calls for course and distance, Survey 3, Block 203, and Survey 1, Block 203½, would overlap Surveys 242 and 255 as shown by the dotted lines on Plat No. 3." (Court's Opinion, pps. 390, 391.)

There is the additional fact finding by this Court to the effect that Williams' field notes of his Survey No. 1, the *key* survey of the series of surveys he made on the ground, "show how Williams was misled by Durrell's theoretical but mistaken field-note relationship between Survey 255 and Survey 1, Block 203½." The Court refers to Survey No. 1 as being the *key* survey made by Williams. Apparently the Court is of the belief that the Durrell mistake, in the location of some of his senior surveys rendered the true West line of senior surveys lying East of Block OW forever unascertainable, and, therefore, it

is perfectly proper to invoke the above mentioned exception to the general rule.

I cannot agree with the Court's conclusion that this record presents a disputed factual situation such as to afford the basis for a discretionary fact finding by any court. The facts are, in the main, undisputed. There is no dispute, for example, as to the identity of objects on the ground and the correct measurement between objects. The record clearly demonstrates that Williams, the original surveyor of Block OW, was never at any time lost, but, to the contrary, knew where the West line of Block 143 was when he called for that line six times in his corrected field notes of Sections 49 and 50. The record is fairly clear as to where Williams surveyed on the ground and where he did not survey. He did not survey the North seven plus miles of his West line of Block OW. In preparing his original field notes, Williams was never on the East line of Block OW. In this connection, it should be recognized (in my opinion it has been recognized by all parties) that the West line of Block 143 is to be constructed off the original monuments set by Durrell. It is undisputed as to the location of these monuments. Draper's map, introduced by Frost indicates there is no dispute as to the distance between the West line of Williams' Sections 49 and 50 and the West line of senior Block 143. If the West line of Block 143 is on the ground as shown on the Draper (Frost's surveyor) Map, then the distances involved are 2,634 varas at the North line of Section 50; 2,626.4 varas at the common line of 50 and 49; and 2,618.6 varas at the South line of Section 49. Other undisputed facts are: Williams did not survey East and measure the distance to the Durrell senior monuments. Had he done so, Williams would have ascertained the location on the ground of Block 143. This, because the senior Durrell blocks were shown and known to be monumented on the ground. As reflected on Sketch No. 1, Durrell's senior monumented surveys have their *West line based* at a point in the North line of Section 255, and all call to run on a course of North. Williams' *junior surveys* (East TIER of Block OW) have their East line based at the same point in the North line of Survey 255, and they all *call to run on a course of North*. Attention is also called to the fact that at the common point in the North line of Survey 255 and at eleven additional points going North up the common line the *junior survey calls to adjoin the senior survey*. As heretofore stated, *six of these twelve adjoinder calls appear in the field notes of Sections 49 and 50.*

For a better understanding of the acts of Williams in locating the beginning point of his *key Survey* No. 1 and his subsequent actions in the preparation of his corrected field notes after discovering that Durrell had been mistaken as to the relationship between his senior blocks and Surveys 254 and 255, I now explain in more detail in Sketch No. 1. The senior surveys to both Durrell and Williams are the areas shaded with dots on the sketch. Survey 255, one of these senior surveys, is of signal importance in view of the fact that Williams' Block OW, and his connection to the senior Durrell surveys, commenced at or in the area of Survey 255. Next, the unshaded surveys East of the line shaded tier (Williams) of surveys are Durrell's senior surveys. These surveys were field noted and on the ground when Williams made his adjoiner calls for them in 1884 and 1885. Of further importance are the circles and squares on this sketch. The circles in the Durrell surveys represent *stone monuments* called for in the Durrell field notes. The squares represent seven (7) earth mounds called for in Durrell's field notes. Some of these field notes have bearing calls and certain identifying descriptions. Some of Durrell's section corners were merely described calls for a stake and mound. These are unshaded on Sketch No. 1. Noted on this sketch is the extreme Eastern tier of sections of Block OW surveyed by Williams. These sections are the ones shaded with lines. The circles shown on the lines and corners of the line-shaded tier of sections or surveys indicate stone mounds called for in the corrected field notes by Williams. It is

important to take note of the *arrows* indicated on this sketch in determining whether or not the adjoinder calls shall prevail over the calls for course and distance. The arrows indicate the approximate location for adjoinder calls for Durrell senior surveys called for in the Williams corrected field notes. It should be noted here that the unshaded sections West of the line-shaded tier of sections are other sections in the *junior Block OW* and are not of any importance in solving our question.

Surveyor Cool will be referred to later in this opinion; however, at this particular juncture, it is well to mention that Sketch No. 1 shows Surveys 204 at the Southeast and 255 at the South end of the line-shaded tier. These surveys are platted in their actual ground relation to each other as found by Surveyor Cool. The importance of Surveys 204 and 255 will be shown later.

Other facts of importance are these: Williams' corrected field notes were filed in the General Land Office on September 15, 1885. On the same day Williams filed a larger and more detailed sketch of the area. This sketch shows Sections 49 and 50 as adjoining Block 143. Not only that, this large sketch, which was introduced in evidence as Frost's Exhibit D, shows the remaining sections to the South of Section 49 as being at that time in conflict with Durrell's Blocks 143, 142 and 203½. Also, the respondent introduced in evidence the General Land Office Map of Pecos County which was in use in 1885. This map, onto which Williams' original and corrected field notes were platted by the General Land Office, shows Sections 49 and 50 adjoining Block 143. With all of these facts before it, the State, acting through the General Land Office, in seven patent proceedings has recognized Williams' adjoinder calls for Block 143. These adjoinder calls appear (1) in Section 56 immediately North of 49 and 50; (2) in Sections 16 and 14 immediately South of Sections 49 and 50; and (3) in the East half of the Southwest quarter of Section 50. As hereinafter more fully discussed, Williams found that Dur-

rell's senior Block 203½ was in conflict with senior Survey 255. Williams, by his corrected field notes, relieved the conflict. This, it seems to me, is an important part of the conclusive evidence that Williams' junior Block OW and the senior Block 203½ adjoin. The corrected field notes confirm the belief that Durrell, Williams and subsequent surveyors to Durrell, recognized that most all, if not all of the senior surveys involved were excessive. My review of this record justifies the conclusion that the fact that excessive acreage existed caused the surveyors to not actually seek the true West line of the senior surveys. It is my opinion that Williams wanted to be certain that no vacancy existed after completion of his work. Therefore, it should be kept in mind that the problem here is not in attempting to follow the footsteps of Durrell and Williams and locating their footsteps on the ground as these two surveyors put them. This is not the problem for the simple reason that the record shows that two surveyors named Draper and Cool have accomplished this very thing. The fact that Durrell was mistaken as to the relationship between his senior Block 255 and 254, SA & MG RR Co. Survey, does not mean that Durrell's senior surveys did not have a certain or ascertainable location.

Durrell spent considerable time on the ground in 1881. The result of his work on the ground is shown in the platted field notes on the attached working sketch. These field notes show the William Howard Survey with 4 monuments; the Nance Survey and Barnett Survey with 6 monuments; the William Glass Heirs No. 8 with 3 monuments; Block 142, 3 rock mounds, 3 earth mounds with bearings or other identifying features and 8 other earth mounds; Block 106, 4 rock mounds and 3 earth mounds with marked stones, and 8 other earth mounds; Block 114, 3 rock mounds and 3 earth mounds; and Block 115, 2 stone mounds and 1 earth mound.

At this point, it is well to state that Durrell's Blocks 203 and 203½ were office survey field notes by him on March 15,

1883, and October 18, 1883, respectively. Although these were apparently office surveys, they represent the work of Durrell calling for adjoinder with the above senior work which had been so recently monumented on the ground. Petitioner's witness, Surveyor Draper, testified that Durrell's locations were ascertainable. I have examined the statement of facts. I find that Draper testified (p. 119–122) in regard to the Durrell and Williams work as it pertained to surveys 49 and 50. Draper says that Williams' work up to the North from Section 29 was paper work, or a paper survey, but that Williams was on the ground at and up to the Northeast corner of 29. Unquestionably, the work to the North was an office survey. Draper testified that the same thing was true as far as the West line of Durrell's Block 143 was concerned. "Durrell was on the ground over here to the East in Section 15, 143. * * *" Draper did not find Durrell on the ground at any point Northwest of 15. Durrell did put in Sections 15, 14, 13, 16, 17 and 18. So, there was an office survey by Williams North of Section 29, and an office survey by Durrell West of 15.

Draper says that Williams' office survey called to adjoin Durrell's West line, but that Williams, in projecting from his point on the ground in Section 29, did not project due North. Draper did not change Williams' direction or course, he merely changed Williams' called bearing. Draper was then asked the following question: "Changed his called bearing, all right, then you come on up here and project on your map at a point in the Southwest quarter of Section 50, and the Northwest quarter of Section 50, and then Williams did his work that could have been located on the ground from his actual ground located down on 29, couldn't it?" Draper answered: "Yes, sir." Thus, according to Draper, Cool and all of the other surveyors, "it was something that could have been ascertainable with accuracy, even at that time." Draper agreed that in 1885, when Williams was doing his work, he could have definitely ascertained Durrell's West line. This record shows that, in fact, Durrell's West line of

Block 143, was not located on the ground just East of 50 and 49, in 1885 (when Williams was preparing his corrected field notes), but Williams could have then, just as Draper, definitely ascertained the West boundary of Block 143.

A surveyor by the name of W. T. Hope resurveyed the lines in question in 1908. Hope testified to finding several of the Durrell monuments. He found the stone mounds at the Southeast corner of Survey 1, Block 142; and two miles North he found a stone mound; at 4,316 varas he found the stone mound at the Northwest corner of Survey 1, W. P. Howard; at the Southeast corner of Survey 15, he found the large stone mound marked "W", at the Northeast of Survey 15, the stone mound marked "VX"; and he located the Northwest corner of Survey 3 by its bearing to Monument Springs and the Northwest corner of Survey 16 by its bearing to Barilla Mountain. The work of Hope constituted, in effect, a relocation of all of the stone mounds called for by Durrell on his East line and North line of Block 142 and Block 143, *and the relocation of one of the earth mounds at the Northwest corner of Section 16.*

There is in the record, also, two plats filed in the General Land Office by A. N. Lea. The one filed on August 29, 1929, designated herein as Sketch No. 2, indicates that Surveyor Lea found and accepted Durrell's monuments at the Northeast and Southeast of Survey 15 in Block 143; the Southeast of Survey 1, Southwest of Survey 2, in Block 142; and the Southeast of 8, Southeast of 5, and Southeast of 2 in Block 115. The plat filed in the Land Office in December, 1913, indicates that Lea found, and accepted as original corners by Durrell, stone mounds at Northeast 27, Southwest 20, Northwest 26, Southwest 21, Southeast, Northeast and Northwest of 3, in Block 146. This also gave Lea two corners in the South line of Block 114. This plat also shows that Lea found a stone mound which he accepted as an original monument at the Northwest of 1 in Block 114 which had not been shown on Durrell's original field

notes. These Lea plats are important for the reason that they indicate that Lea established that the Durrell monuments have been found and recognized through the years. The location of the Durrell monuments indicate an excess over called distance between Durrell monuments. Also these plats indicate that Durrell's monuments on the ground bore slightly East of their called North course. All of the evidence conclusively show that Williams was entitled to treat the Durrell senior surveys as having a certain or ascertainable location.

Lea's Sketch of July 20, 1929

South Middle Part

Lea's Sketch of July 20, 1929

North Middle Part

The fact that Durrell made the mistake now to be discussed fades into the realm of immateriality in view of the conclusiveness of the ascertainable location of the West boundary line of the Durrell senior surveys to the East of Block OW. At this point attention should be directed to senior surveys of Durrell and Williams. Particular

attention is drawn to Surveys 254, 255 and 204 outlined in pink upon the above plat. Williams filed his original field notes sometime in April, 1885. Durrell's field notes, describing the numerous monuments mentioned above, were on file in the surveyor's office in Fort Stockton. Both Durrell and Williams worked out of Fort Stockton. Durrell's field notes were also on file in the General Land Office. Durrell and Williams, according to a report filed by Williams, had worked together on what is designated in the records as a "connecting run" which had commenced at the Northeast corner of Section 254 (from which Section 255 is built) in March, 1884. This, to me, is evidence that Williams knew the blocks he called to adjoin were on the ground and worthy of the adjoinder calls which were called for in his field notes prepared in 1884 and 1885. Sometime between April, 1885, the date Williams filed his original field notes for Sections 49, 50 and 56, and July, 1885, when he reported making the connecting run, Williams discovered that Durrell had been mistaken as to the relationship between Durrell's senior blocks and Surveys 254 and 255. Durrell's surveying began at 204 (Fort Stockton). Williams made his connecting run from this same survey. C. H. Comley, the original surveyor of Surveys 254 and 255, called in his field notes for the *Northeast corner* of Survey 254 to be located 12,150 varas West of the *Northwest corner* of Survey 204. Actually it was the *Southeast* corner of Section 254 which was 12,150 varas West of the Northwest corner of Survey 204. This is definitely shown on a plat accompanying the field notes. These field notes were on file in Pecos County. However, the field notes of Survey 254 on file in the General Land Office had been corrected to show that the *Southeast corner* of 254 rather than the Northeast corner was 12,150 varas West of the Northwest corner of Survey 204. Evidently Durrell had accepted the field notes on file in Pecos County and had treated Survey 254 as *building South* from the reference point, whereas *it should have built North*. The

lines of Surveys 254 and 255 were not called to run due North but run North 4° East. Consequently, the result of Durrell's error was that Surveys 254 and 255 were located further *North* and further *East* than Durrell had supposed, and instead of Durrell's Blocks 203 and 203½ being North of Survey 255, they were, in fact, in conflict with Survey 255. Williams' corrected field notes eliminated conflicts with senior surveys in a manner now to be shown. After reading the evidence, I have concluded that Respondent's brief accurately states the work of Williams in 1885, hence, the statement contained in the brief is followed. It is stated that after discovery of Durrell's error, Williams' recorded report shows that he made a connecting run in July, 1885, to determine the ground relationship between Senior Survey 254 in the West and Senior Surveys 204 and 150 in the East. By his report, he commenced at "a pile of rocks at the Southeast corner of Survey No. 254" with bearing calls to an old adobe stage stand in a large cottonwood at Frazer's ranch, then ran Southwesterly and West tying in various corners monumented by him in his survey of the Southern part of his Block OW (not the part involved in this lawsuit), and then ran East to tie in the Southeast corner of Survey 150 at Fort Stockton—which is in the same meridian with the West line of Survey 204 and also the East line of Durrell's Block 146 and 114. His sketch of the entire area involved in this lawsuit shows the course of this run by a dotted or broken line and shows the monuments called for by him as small circles. The sketch also shows that Durrell had, indeed, been mistaken in regard to his relationship to Senior Surveys 254 and 255 and that his Blocks 203 and 203½ were, to an extent, in conflict therewith— and that Durrell's West line of Block 203½ was intersecting the North line of Block 255 *further West than previous field-note calculations had indicated.*

By the information contained in his connecting run Williams could see that he had placed his East line of Block OW in conflict

with Durrell's senior Block 203½. Both Surveyor Draper and Cool, who testified in this case, explained the method by which Williams obviously determined the extent to which his East line of Block OW had been placed in conflict with Durrell's Senior Survey at the point of intersection in the North line of Survey 255. Petitioner introduced in evidence a sketch and explanation prepared by Surveyor Draper, which sufficiently demonstrated the method by which Williams had made his calculation after determining the *ground distance* from Survey 254 to Survey 204. The *ground distance* determined by Williams was 11,962.1 varas. By calculation the Northwest corner of Survey 255 (from which Williams originally had gone East 316 varas to commence his East line of Block OW) would be located 963.8 varas further West. This made the Northwest corner of Survey 255 to be a total of 12,925.9 varas West of the West line of Survey 204 at Fort Stockton.

It appears that Williams' next computed Durrell's *field note position* for the West line of Block 203½. This was simply the addition of 11,400 varas (field note width-Block 146), plus 992 varas (field note width of Survey 2, Block 203), plus 500 varas (field note width of Block 203½), giving him a total Westing of 12,892. Williams evidently then subtracted this 12,892 vara total *field note distance* from his *ground distance* and *calculated distance* of 12,925.9 varas, and obtained a remainder of 33.9 varas. Stated simply, this exercise showed that Durrell's West line of Block 203½ was located 34 varas East of the Northwest corner of 255. In his original field notes of Survey 1, Block OW, Williams had called to go East (South 86° East) from the Northwest corner of Survey 255 before turning North with his East line of Block OW, and this indicates that he was in conflict with the Senior Survey by 282 varas—the difference between his 316 varas and the 34 varas obtained by the foregoing calculations. As is later seen, Williams corrects his distances by this 282 varas to get out of conflict with the Senior Survey.

This gets me back to Williams' location of Survey 1, Block OW, designated by the Court as the *key* survey. The Court apparently believes that Williams was misled by Durrell's mistake hereinabove discussed when he, Williams, was locating this so-called key survey and that as a result, thereof, a vacancy exists several miles North of Survey 1. This is far from being a valid assumption. I repeat that Williams was not lost when he eliminated the 282 vara conflict. He simply discovered when he made the "connecting run" in 1885 that he had placed his East line of Block OW in conflict with Durrell's senior Block 203½. The record in this case shows by uncontradicted testimony that the West line of Block 203½ and the East line of Block OW intersect the North line of Survey 255 at a common point. These lines proceed thence on calls for a "North" course. Of course, there is a variance in distance, but, a mistake in distance does not mean that Williams did not know that Durrell's blocks were on the ground to the East of him. Williams had no intention to do otherwise than to be certain that the East line of Block OW adjoin the senior Durrell surveys to the East. Having recognized and determined that originally his East line of Survey No. 1, at the point in the North line of 255, was in conflict with Survey 203½, how did he make certain to insure adjoinder? The answer is simple. The Southeast corner of his Survey No. 1 was first tied on the ground to Senior Survey 255. Then, instead of surveying North around the Northwest corner of Survey 255 and then surveying and setting his monuments North along the line of Senior Block 203, he went West approximately a mile and ran his ground line which he intended to adjoin. To have done otherwise, he could not have made use of the adjoinder calls as he did. To have run his ground survey along his East line it was likely that any miscalculation or mismeasurement would cause his monumented line to not be located precisely on the senior line, where he desired it to be. Williams knew that if he moved the one mile West, made his

ground run and set his measurements, and then called for adjoinder with the senior line on the East, he was assured of accomplishing the intended adjoinder. Perhaps, in closing this discussion of the facts, it would be well to point out that Frost's surveyor, Draper, at no time went to the South end of Block OW. He went nowhere near the North line of Survey 255. Therefore, he was not in a position to disprove, in behalf of Frost, that Block OW and senior Block 203½ had a common point at the North line of Survey 255. Whereas, respondent's witness, Cool, actually went to the Southeast corner of Survey 254. From there, Cool determined the ground distance between Survey 254 and the Northwest corner of Survey 204. The testimony shows that Cool performed his measurements by triangulation, the most accurate measurement available to surveyors, according to the surveyors who testified. Cool testified that, where Williams recorded 11,962 varas between the Southeast corner of Survey 254 and the Northwest corner of 204, he found, by triangulation, 12,017 varas, which is a difference of 55 varas. This means that Williams had a 55 vara excess between the two points. Breaking this down further, it means that over the distance of 6 miles between Survey 254 and Survey 204 there is an excess of 9 varas to the mile. Cool further testified that there was an excess in Durrell's work; he [Cool] found Durrell's Southwest corner and that he found enough excess to "take out" of Williams' excess all but 15 varas of the 55 vara excess. The result of Cool's work, by triangulation showed about a 5 vara difference between Cool's measurements and the measurements made by Williams. In effect, Frost is asking this Court to disregard adjoinder calls merely because of a 5 vara discrepancy in recited distances. To so hold would disrupt settled titles to land, especially in West Texas. The vacancy hunter would be in the saddle again. As heretofore stated, excess acreage will be found in all of the surveys involved in this very case. We have here only a mistake as to the distance necessary to reach the senior survey called for in the adjoinder. This cannot and does not show a mistaken adjoinder. If Frost prevails in this case, then it will naturally follow that the area South of Blocks 49 and 50 which has been severed out of this case will be held to be vacant lands.

As held in Stanolind Oil and Gas Company v. State, 129 Tex. 547, 101 S.W.2d 801 (1937), the evidence in this case requires that the general rule that calls for adjoinder should be given controlling effect over calls for course and distance.

The rule governing a situation where an inconsistency exists, as it does here, between the distance recited in the field notes and the actual location of objects called for was well stated by this Court in the case of Cross v. Wilkinson, 111 Tex. 311, 234 S.W. 68 (1921) wherein it was held:

" * * * an inconsistency being shown between the calls for distance and the calls for the adjacent lines on the application of the calls to the land itself, no other extrinsic facts being shown, the calls for distance would yield to the calls for the adjacent lines."

and

"The lines were returned by means of field notes and the accompanying sketch. The field notes and the sketch were explicit in making the east lines of the railroad surveys of the west lines of the school land surveys. Under settled rules of construction, the calls in the field notes and sketch for adjacent lines were entitled to prevail over the variant calls for distance only. Maddox v. Fenner, 79 Tex. [279] 291, 15 S.W. 237; Davis v. Baylor, 19 S.W. 524."

Where the adjoinder call is ascertainable, as here, such calls have the same dignity or rank as a call for a natural or artificial object. It is well settled, as said in Kirby Lumber Company v. Gibbs Brothers & Company, 14 S.W.2d 1013 (Tex.Comm.App.

1929, jdgmt. adopted), that "[a] call for adjoinder is like a call for a natural or artificial object, and any conflicting call for course, distance or acreage, and the like, must yield." Couch v. Tex. & Pac. Ry. Co., 99 Tex. 464, 90 S.W. 860 (1906); Titterington v. Trees, 78 Tex. 567, 14 S.W. 692 (1890); Boon v. Hunter, 62 Tex. 582 (1884); Ruth v. Carter-Kelly Lumber Co., 286 S.W. 322 (Tex.Civ.App.1926, no writ); Chapman v. Hamblet, 100 Me. 454, 62 A. 215 (1905); Percival v. Chase, 182 Mass. 371, 65 N.E. 800 (1903); Curtis v. Francis, 63 Mass. 427, 438; Whitaker v. Cover, 140 N.C. 280, 52 S.E. 579, 581 (1905); Fincannon v. Sudderth, 140 N.C. 246, 52 S.E. 579 (1905); Airey v. Kunkle, 7 Pa. Super. 112; Miller v. Holt, 47 W.Va. 7, 34 S.E. 956 (1899). The more recent case of Arrot v. Smith, 225 S.W.2d 639 (Tex. Civ.App.1949, no writ) in citing *Kirby*, supra, made the same holding. These cases are those where unmarked lines were called for. Another case dealing with unmarked lines where the ascertainability of such lines is derived from some source other than the lines themselves is the case of Gulf Production Co. et al. v. Camp, 32 S.W.2d 881 (Tex.Civ.App.1930), affirmed by this Court in Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773 (1933). In that case the court held that it was "well settled in this state that in a proper case an unmarked line will be given dignity of an 'artificial object' and a call for connection therewith will prevail over a variant distance call. The leading case to this effect is Maddox Bros. & Anderson v. Fenner, 79 Tex. 279, 15 S.W. 237. The field notes of the southern tier of sections in Block 25 and 24 call for adjoinder with the north line of the University blocks." The same rule is concisely stated in Phillips Petroleum Company v. State, 63 S.W.2d 737, (Tex. Civ.App.1933, writ ref'd). There the Court said: "And, where an established line of a senior survey is called for, *or a line of a senior survey which may be definitely ascertained and located from other established corners of the same or adjacent established surveys, such calls should be given the dignity of an artificial object and control calls for course and distance."* (Emphasis added.) This case stands for the proposition that a line called for is considered to be an ascertainable line if its location can be determined from other corners in the survey or system of surveys involved. In the present case the West line of Block 143 is not shown to have been monumented on the ground by any artificial monument set by Durrell. However, it can definitely be ascertained by surveying it from the other monuments which were found, as heretofore pointed out, in Durrell's Blocks 142 and 143. Both surveyors testified that this location was ascertainable, just as they also agreed that the Northern sections of Block OW are ascertainable by the projecting of Williams' lines on Northerly from his monuments. In so agreeing, these surveyors recognize the principle of the "system of surveys." See Brooks v. Slaughter, 218 S.W. 632, (Tex.Civ.App.1920, no writ); Standefer v. Vaughan, 219 S.W. 484 (Tex. Civ.App.1943, writ ref'd. W.O.M.).

As heretofore noted, Frost relies upon Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792 (1933). In that case there were two adjoinder calls. One of these adjoinder calls was upheld by the Court and the other was not. *Turner*, as well as the cases of State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228 (1936), and Humble Oil & Refining Company v. State, 104 S.W.2d 174 (Tex.Civ.App.1936, writ ref'd.), actually fall within a well recognized exception to the adjoinder rule. The facts in these cases must be examined to determine whether or not our case falls within the exception. Our case does not, in any manner, come within the exception. A careful reading of these cases shows they are distinguishable. In *Turner*, for example, this Court in considering the peculiar facts of that case, adhered to the principle of boundary law: "that a suppositions call, made upon an erroneous belief as to the location of an object, will not prevail over a call for course and distance, whether the survey was actually made upon the ground or was an

office survey." If the facts in our case are properly followed it should be clear that the Williams' adjoinder calls were not merely conjectural as in *Turner*. In *Turner*, the Court said: "As to the surveys in Block 178 for which Durrell called to adjoin on the south, his own testimony in this case, * * * demonstrated that he did not know their true positions, but called for them merely by conjecture." *Sullivan* is clearly distinguishable. Under the peculiar facts in that case the Court held that the exception was available. In *Sullivan,* the Court said:

"Our decision is not in conflict with Camp v. Gulf Production Company, 122 Tex. 383, 61 S.W.2d 773, because in that case, as disclosed by the record, the opinion of the Court of Civil Appeals (32 S.W.2d 881) and the opinion of the Supreme Court, *there was no evidence of mistake except in excess,* in distance, of 175.2 varas in approximately five miles, about 35 varas per mile. Such inconsiderable excess is not of itself evidence that the surveyor was mistaken in the location of the adjoinder for which he called, but, when there is no other evidence of mistake, it is usually, as it was in Camp v. Gulf Production Company, taken to mean that the mistake was in the measurement or in the calculation of the distance."

Our case involves an excess as a result of divergence of Williams' and Durrell's lines as they run North 19+ miles, approximately 26 varas to the mile. In my opinion, Judge Smedley, the writer of the opinion in the *Sullivan* case, would have held in the present case that the facts are not even suggestive of a mistake in location of the adjoinder for which Williams was calling.

The judgment of the Court of Civil Appeals should be affirmed.

GRIFFIN and HAMILTON, JJ., join in this dissent.

ON MOTION FOR REHEARING

SMITH, Justice (dissenting).

C. M. Frost filed this suit pursuant to Article 5421c, claiming and asserting the existence of a vacancy in Pecos County, within five (5) miles of a well producing oil or gas in paying quantities. This statute defines "vacancy" as meaning "an area of unsurveyed school land not in conflict on the ground with lands previously titled, awarded, or sold, which has not been listed on the records of the land office as school lands and which on the date of filing was neither subject to an earlier subsisting application to purchase or lease by a discoverer or claimant nor involved in pending litigation brought by the State to recover the same."

The judgment of the trial court recites that Frost pleaded a vacancy existed and the judgment contains a description of such lands. However, the judgment recites that Frost limited his proof of vacancy under his application to the tract of land involved in this appeal to the rectangular tract of land alleged to lie between the east lines of Junior Surveys 49 and 50 Block OW, and the west lines of Senior Surveys 13, 18 and 19, Block 143. The trial court's judgment recites that Frost discovered the vacancy, but that certain good faith claimants have the preferential right to purchase all of the contracted area, except a specific tract described in paragraph 11 of the judgment for which the trial court found that there was no good faith claimant.

Significantly, all of the good faith claimants have joined Lowe and Mobil in urging the Court to grant a motion for rehearing, declare no vacancy, and affirm the judgment of the Court of Civil Appeals. These good faith claimants agree that no vacancy exists.

Furthermore, these good faith claimants are aware of Paragraph 12 [1] of the trial court judgment which recites that Frost incurred expenses, exclusive of filing fees, in the sum of $2,543.40, and that the good faith claimants should lose all preferential rights if they failed, for a period of ninety (90) days after final determination of the existence of a vacancy to pay certain shares of the expenses incurred by Frost. I cannot believe that the attorneys for the good faith claimants would join in the motion for rehearing just to avoid paying a portion of Frost's expenses. Their prime reason, it seems to me, is because their knowledge of the record convinces them that the Court has failed to properly evaluate the controlling evidence in this case. If the Court persists in ignoring the "system-of-surveys" rule and continues to hold as it has done that there is a vacancy at the north end of Williams' "system-of-surveys" (the end involved in this suit), then it will be bound to hold in the severed case and other vacancy cases pending involving the 19+ miles strip claimed that such strip is vacant. The fact that this 19 miles strip is narrower at the south end where Williams began his system of surveys than at the point between his Junior Surveys 49 and 50 and the Senior Durrell surveys immediately to the east of surveys 49 and 50 is not controlling. My point is that surveys 49 and 50 must be considered as a part of the same system of surveys, and as Lowe argues, these surveys "cannot be located independent or isolated from the rest of the same system of surveys." I respectfully submit that this Court is in error in saying that Frost or any other vacancy hunter will not be able to use the present decision as absolute authority for holding upon final trial that a vacancy [very narrow] exists from a point beginning in the west line of Survey 255 at the southeast corner of Survey 1 by Williams to the northeast corner of Survey 50, which is considerably wider. As I view this record, the Court must either honor the adjoinder calls all the way from south to north or not at all. I chose the former action because of the undisputed controlling facts in this case. The adjoinder calls should not be broken at any point—at Block 203½, or at any point. The Court failed to recognize basic boundary law when it suggests as it does in its decision that so far as Williams' Junior Surveys are concerned facts have not been developed as to how Survey 2, Block 203½ was placed on the ground. Block OW, of which Surveys 49 and 50 are a part, surveyed by Williams is a system of surveys, each tied to the other by Williams. Block 203½ is also a system of surveys by Durrell. Durrell's work was senior to Williams system of surveys. Although Block 203½ consists of only Surveys 1 and 2, and although Surveys 1 and 2 were field-noted by Durrell on the same day and Survey 2 calls to have its southeast and southwest corners common with the northeast and northwest corners of Survey 1, and its east and west lines of Survey 1, thus definitely locating Survey 2, Block 203½, yet, the Court seems to think it is possible, with additional evidence as to the location of

---

1. That plaintiff's expenses incurred in determining the existence of said vacancy, exclusive of filing fees, amount to Two Thousand Five Hundred Forty-three Dollars and Forty Cents ($2,543.40), that the good faith claimant named in paragraph 9 above should lose all preference rights in respect to the portion of the vacancy described in said paragraph if he fails, for a period of ninety (90) days after final judicial determination of the existence of said vacancy, to pay to plaintiff the sum of Six Hundred Thirty-Five Dollars and Eighty-five Cents ($635.85), being a fair, proper and proportionate part of plaintiff's said expenses, and that the good faith claimants named in paragraph 10 above should lose all preference rights in respect to the portion of the vacancy specified in said paragraph if they fail, for a period of ninety (90) days after the final judicial determination of the existence of said vacancy, to pay back to plaintiff the sum of One Thousand Two Hundred Seventy-one Dollars and Seventy Cents ($1,271.-70), being a fair, proper and proportionate part of plaintiff's said expenses.

Survey 2, Block 203½, to not break apart Surveys 1 and 2 of Block 203½.

The burden rested upon Frost to plead and prove a vacancy. He has failed in his proof. Frost has tied himself to the evidence which shows a system of surveys by Williams which conclusively shows only a variance in distance from his beginning point at the south. The mistakes by Williams and Durrell were mistakes in distance calculation only. The effect of what the Court has done is to break the adjoinder calls at places although the entire east line of Block OW (by Williams) was done by office survey—calculation of distance and not measurement on the ground. Williams was never on the east line of his Block OW, however, his 1885 corrected field notes call for the east line to be one continuing line from south to north. The Court has reached the wrong conclusion regarding the mistake of Durrell as to the location of Surveys 242, 254, 255 and 541, which were senior to Durrell's above mentioned surveys. Durrell's mistake, based on Comley's error, was a mistake as to distance only. It is undisputed that Durrell did make a mistake in relying on prior surveyor Comley's connection between Survey 254 and Survey 204. As pointed out in the original dissent, Williams discovered this mistake when he ran his connection between the two groups of senior surveys to both Durrell and Williams. This was in July, 1885. Due to Durrell's mistake in relying upon Comley's work, and not because Williams did not know the location of Durrell's west line, Williams began his original work at a point which Comley's field notes locate the *northeast corner of Survey 204* (Fort Stockton) when actually it was the *southeast corner of Survey 254* which was 12,150 varas west of the *northwest corner of Survey 204*. This is the crucial point in this case for the reason that when Williams ran his July, 1885 connection from the vicinity of Survey 255 over to the surveys in the vicinity of Fort Stockton, *he discovered by his own ground measurement* that Block

OW conflicted with Durrell's senior work to the east. Regardless of the extent of the conflict, the undisputed evidence shows that Williams' original work created a conflict which he realized should be eliminated. What did Williams do to eliminate the conflict which he knew existed in 1885? If Williams had not known where the Durrell west lines were located he would not have become aware of a conflict. This awareness was not limited to the south end of the Durrell senior surveys but extended the entire distance north of the senior system of surveys. It is undisputed that both the senior surveyor, Durrell, and junior surveyor, Williams, called for their respective north-south lines to run true north. A proper evaluation of the controlling facts leads to the conclusion that the conflict existed from the south end all the way north through Sections 49 and 50 in Block OW. The conflict was not merely a field-note conflict. The conflict was definitely ascertained as the result of Williams' groundwork in July, 1885. While Durrell and Williams called for their respective north-south lines to run true north, actually they did not. Years later, it was definitely ascertained by resurveys that Durrell was approximately ¼° east of true north and Williams was approximately ¼° west of due north. This caused a gradual and continuous widening between Williams' and Durrell's lines the farther north they went. Now what line by Williams do I have reference to? It is the line Williams ran after getting straightened out in July, 1885. Here are the undisputed facts which show that Williams was never misled by any mistakes of Durrell. The evidence shows that Williams moved west to remove the conflict. He knew where the Durrell west lines were. He was never lost. Instead of running his ground lines North along the east line of Block OW, Williams tied his southeast corner of his Survey No. 1 on the ground to the Senior Survey 255. Then Williams ran west approximately one mile and ran his ground line north to a point at the northwest corner of Survey 10, Block OW.

I should point out that Williams did not actually run this west line of his eastern tier of sections on the ground in a true north course. Williams ran a course of 15 minutes west of north for a distance of 12 miles and stopped. Perhaps this distance was 14 miles, but, in any event, Williams never actually surveyed Surveys 49 and 50 on the ground. Williams' field notes of Surveys 49 and 50 were and are the result of an office survey. In other words the surveying done by Williams north of the 12 or 14 miles from his southmost beginning point, or north of the Survey 29, Block OW was by projection only. Therefore, as to the work by projection all lines necessarily ran as called for. Williams was obtaining his distances by calculation only when seeking to reach the west line of Block 143. Definitely, he did not actually survey over to the west line of Block 143 (located by Durrell through a system of surveys) on either of the six instances when he called to go to the west line of Block 143. The intention of Williams was to eliminate any possibility of his work, either by actual surveying or office calculation, creating a vacancy. This record is replete with evidence showing Williams' intent to adjoin the west line of the senior surveys to the east, particularly Survey 143 which is located to the east of Surveys 49 and 50. Williams' field notes contain 20 adjoinder calls for Durrell's Senior Blocks 203½, 142 and 143. A variance between the distance calls in the field notes and the measured distance on the ground simply does not establish a vacancy. This variance does not defeat the intention of Williams to accomplish an adjoinder.

This record conclusively shows that the Court has no alternative but to give priority to the adjoinder calls in this case. The surveys made by Durrell and Williams, part ground and part projection, were made more than 80 years ago. Williams' intention in calling to adjoin the definitely ascertainable west line of Block 143 is reflected in his work. It is clear to me, at least, that his every effort was to remove any doubt about the location of Surveys 49 and 50. This intention was accomplished and never questioned until Frost entered the picture after the discovery of valuable minerals within five (5) miles of Survey 49, 50 and 143. The good faith claimants in this suit have never believed that a vacancy exists. Much of the area involved has been under fence for many years. If there was ever a case where the calls for adjoinder should govern over the calls for distance it is this one.

It would unduly lengthen this opinion to discuss the authorities supporting the respondent's position. These cases were cited in the original dissent. Perhaps I should explain the nature of the severance referred to above. The State Commissioner of the General Land Office, represented by the Attorney General of Texas, filed a trial amendment asserting title in the State of Texas to two (2) tracts of land in Pecos County, Texas. As to these tracts, the trial court recites in its final judgment that the issues presented in the trial amendment were severed to be finally determined in a separate trial. I would grant the motions for rehearing and hold no vacancy.